## Case No. 16,640.

UNITED STATES v. WARDWELL et al..

[5 Mason, 82.] [1]

Circuit Court, D. Rhode Island. June Term, 1828.

PURSER IN NAVY—OFFICIAL BOND—APPLICATION· OF PAYMENTS — PAYMENTS BY ADMINISTRATOR OF INSOLVENT ESTATE — DEBTS DUE UNITED· STATES.

1. The act of 1817, c. 197 [3 Story's Laws· 1622; ·3 Stat. 350, c. 24], respecting the bonds of persons in the navy, having required, that every person then in service &c. shall, instead of the bond required by a former act, enter into· a new bond with sureties, conditioned for the faithful performance of his duties &c., the sureties on the old bond are discharged from all responsibility for monies received by any person &c., after he has given the new bond, the latter being, by the act, a substitute for the former.
[Cited in Spencer v. Houghton, 68 Cal. 86, 8· Pac. 679.]

2. In case of payments by a debtor to a creditor, the debtor has a right to direct the appli-

[1] ]Reported by William P. Mason, Esq.]

cation of them, and if he does not, the creditor may apply them as he pleases.

[Cited in Caldwell v. Wentworth, 14 N. H. 437.]

3. In cases of payments to the treasury department, the officers of that department have not a right to make any application of such payments against the will of the debtor, or of his administrator.

4. In case of payments made by an administrator of an insolvent estate, all such payments must be deemed to be made on general account, and pro rata towards the extinguishment of all the debts due to the creditor.

5. The United States having a priority by law in such cases, does not change the rule. The duty of the administrator is the same.

6. In cases of running accounts, where debits and credits are made at different times, the payments are to be deemed as made towards items antecedently due, in the order of time in which they stand in the account.

[Cited in Gass v. Stinson, Case No. 5,262; U. S. v. Bradbury, Id. 14,635; Schuelenburg v. Martin, 2 Fed. 750.]

[Cited in Conduitt v. Ryan, 3 Ind. App. 9, 29 N. E. 163; Smith v. Loyd, 11 Leigh, 512; Chapman v. Com., 25 Grat. 744; Morgan v. Tarbell, 28 Vt. 503; Norris v. Beaty, 6 W. Va. 482.]

7. The case of the United States furnishes no exception to this rule in cases of running accounts. All payments are deemed to be made on general account.

[Cited in State v. Sooy, 39 N. J. Law, 549.]

This was a bill in equity brought under the following circumstances: Benjamin F. Bourne, on the 14th of April, 1814, was appointed a purser in the navy of the United States, and gave a bond to the United States, with Abel Jones and Stephen Price, as sureties, in the penalty of $10,000, for the faithful performance of the duties of his office, in the usual form. On the 30th of April, 1817, Bourne gave another bond to the United States, with Stephen Price, C. A. Dale, and George Johnson, as sureties, in the penalty of $25,000 for the like purpose, pursuant to the act of congress, of the 1st of March, 1817, c. 24 [3 Stat. 350]. Bourne continued in office until his death, on the 10th of November, 1823. During this period, large sums of money were advanced to him as purser, to be expended for the use of the United States. On the 5th of October, 1826, the accounts of Bourne, for receipts and disbursements, were adjusted at the treasury department. The balance found due to the United States on the 30th of April, 1817, was $7,560.86; and a further balance was found due up to the 10th of November, 1823, of $31,556.88; in the whole amounting to $39,-117.74. On the 14th of November, 1823, John Howe, one of the defendants, was appointed administrator on Bourne's estate; and on the 22d of September, 1826, he paid to the district attorney, for the use of the United States, on account of money due to the United States, from the estate, the sum of $4,-968.42. Howe, at the time of payment, claimed the right to apply the same in part payment of the said balance of $7,560.86, and the district attorney claimed for the United

States the right to apply the same in part payment of either of the balances aforesaid, at the election of the proper officers of the treasury department; and it was agreed between them, that the payment should be made, without prejudice to the right of either party to apply the same to either of the balances aforesaid, at their election. The money so paid, had been in fact applied by the officers of the treasury, in part payment of the said balance of $31,556.88. No farther monies have been paid by the administrator of Bourne, for want of assets.

The bill, after stating the preceding facts, alleges, that Price is without the jurisdiction of the court; that Dale and Johnson are insolvent; that Abel Jones died in September, 1815, leaving a large real and personal estate; that Julia B. Jones, his widow, John Wardwell, and the said Howe are administrators upon his estate, (and are made defendants to the bill,) and have possessed themselves of personal estate to a large amount, to wit, $21,255.19; that Julia S. Jones (also a defendant) is the daughter and sole heir at law of Abel Jones, and has by descent from her father real estate to the value of $30,000, which ought to be applied to the payment of the debts so due to the United States. The bill, therefore, prays for discovery and relief in the premises. The administrators of Jones, in their answer, deny knowledge of the particular balances due from Bourne to the United States; and admit the receipt of assets of Jones, to the amount of $27,778.25, and payment of the same in the course of administration. They assert that on the 18th of December, 1817, Bourne's accounts were settled at the treasury, and that a balance of $8,697.48, found due from him to the United States, was charged in a new account against him, to be expended by him for the use of the United States; and that it was so expended. They insist, that the act of congress of 1st March, 1817, from the time of the execution of the second bond, had the effect of superceding and annulling the first bond; that not knowing of any balance due to the United States, they, on the 1st of May, 1817, settled their administration account on Jones's estate, in the probate office, and paid the balance in their hands to the widow of Jones, who was also guardian of his daughter Julia. They allege, that no suit was commenced against them, as administrators, by the United States, within three years after their appointment, and rely on the statute of limitations of Rhode Island as a bar to the suit. Howe, as administrator of Bourne, denies any further assets; and asserts, that the payment to the district attorney was without prejudice to his right to make application thereof, so far as he was entitled by law to do, denying that he ever assented to, or authorized the application so made by the treasury department, and insisting on his right to apply the same towards the discharge of the first

bond. He also asserts the utter insolvency of Bourne's estate. The defendants farther allege, that Bourne, in his lifetime, after the adjustment of his accounts, on the 18th of December, 1817, paid for the United States large sums of money, greatly exceeding the sum of $8,697.48, in payment of the same balance found due to the United States; which sums the United States ought to apply to the discharge of the same. They farther allege, that the estate of Jones is not responsible by reason of the neglect of the officers of the government to settle Bourne's accounts, and to give due notice thereof to Jones, and by their giving him new credits &c. The usual replication was filed.

R. W. Greene, for the United States.
Howe & Searle, for defendants.

STORY, Circuit Justice. There is no controversy as to the facts in this case; and the whole resolves itself into mere questions of law. I pass over all the grounds insisted upon by way of laches on the part of the officers of the government, for the decisions of the supreme court have fully settled them. The first ground insisted on by way of defence is, that the act of 1817, c. 197 [3 Story's Laws, 1622; 3 Stat. 350, c. 24], is a complete discharge of the first bond as to all sums received after the second bond was executed. The statute provides, "that every person now in service, or who may hereafter be appointed, shall, instead of the bond required by the act, to which this is a supplement, enter into a bond with two or more sufficient sureties, in the penalty of $25,000 conditioned for the faithful discharge of all his duties as purser in the navy of the United States, which sureties shall be approved," &c. My opinion is, that the argument is well founded. The new bond is to be given instead of, that is, in the place or room of, the old bond, and not in addition to the latter. It is a complete substitute for, and not a supplementary security to, the former. To construe the act otherwise, would be a plain departure from the meaning of the terms, and, as I think, also from its true object and intent. From the time the second bond was given, I am therefore of opinion, that the first bond was functus officio, as to future responsibilities for future advances. Then as to the payment made to the district attorney by the administrator of Bourne. Generally speaking, the debtor has a right to make the application of payments, as he chooses; if he omits so to do, the creditor, having different debts, may make the application to which he pleases. If neither party makes any application, the law will adjust it by its own notions of the equity and justice of the particular case. It is plain, that the officers of the treasury department had no power to make an absolute application of the present payment by the administrator, to the liquidation of the last balance, unless the

law justifies it upon general principles. If either party had a right to direct the application, it was the administrator of Bourne; and if applied according to his direction, it goes to the reduction of the first balance. But I doubt, exceedingly, whether an administrator is subrogated in this respect to all the rights, which the debtor himself would have, if living. Especially do I doubt it, in case the estate is insolvent. When a debtor here dies insolvent, all his estate is distributable among his creditors, pro ratâ, with the exception of certain privileged creditors having priorities, such as the United States, the state, and creditors for charges of the last sickness, and of the funeral of the party. In such cases of administration, it seems to me, that all the demands of each creditor form one consolidated debt, and that the payments made, are to be pro ratâ upon the whole, to be applied in the same way towards the discharge of the whole. The administrator has no right, at the instance, or for the benefit, of third persons, to direct the payment to be applied on account of any particular debt. He is bound to pay, on all debts, a pro ratâ sum. If this be so as to ordinary creditors, the circumstance, that the United States have a priority, does not change the duty imposed by law; for if the assets are not sufficient to pay all the debts due to the United States, the same reason applies, that is, that the payment shall be pro ratâ on all. The administrator acts, not for himself, nor for sureties, nor upon personal preferences, but as a trustee for the benefit of all the creditors pari passu. And I think the law requires him in the execution of the trust, to distribute the burthen and the benefits equally among all the creditors, without preferences, and without prejudice to the rights of any sureties. Upon these principles, my opinion is, that the sum paid by the administrator ought to be applied, as of right, to both balances, discharging each pro ratâ, in the portion which the respective amounts bear to the whole sum paid. Perris v. Roberts, 1 Vern. 34, proceeded on principles which afford a just analogy.

But another ground of defence supercedes, or rather, renders the former unimportant. It appears, that the accounts of the treasury have run on, from time to time, ever since his first appointment, charging him with advances made, and crediting him with disbursements. Balances have been struck from time to time; and the balances have been again carried forward to the debit side of the new accounts. It is, therefore, the common case of a running account, where there are various debits and credits on each side, and the question is, in such a posture of things, where there has been no specific application made of any payments, by either party, to any specific items, how the payments thus passed into general account are to be deemed, in point of law, to have been applied. My opinion is,

that they are to be considered as applied in discharge of the items antecedently due, in the order of time in which they stand in the account. This is the natural, and, as I think, the legal result of carrying the credits into general account. The doctrine of Clayton's Case, 1 Mer. 572, 604, 608, is directly in point, and stands upon irresistible reasoning. It is confirmed, if confirmation were necesary, by Bodenham v. Purchas, 2 Barn. & Ald. 39, Simson .v. Cooke, 1 Bing. 452, and Simson v. Ingham, 2 Barn. & C. 65. The case of U. S. v. January, 7 Cranch [11 U. S.] 572, has been supposed to justify a different doctrine. It appears to me, that such is not the true explanation of that case.[2] It turned wholly up-

on its own particular circumstances, and the charge of the circuit court, which, with reference to the facts, the supreme court thought erroneous. The questions then were, (1) whether the supervisor had any right to make a special application of any prior payments, made on general account, and if he had, then, (2) whether the promise of the supervisor to make a particular application of the payments, after they had been passed into general account, was, per se, an application of such payments, unless followed by some positive act of appropriation. The supreme court decided both points against the defendant; and overruled the contrary decision of the circuit court. The case of U. S.

---

[2] NOTE BY JUDGE STORY.

**United States vs. January & Patterson.**

(Supreme Court of the United States, February Term, 1813.)

This case, as reported in 7 Cranch [11 U. S.] 572, is inaccurately given, as to the facts apparent on the record; and I therefore transcribe them from the bill of exceptions, upon which alone the opinion of the supreme court proceeded. It was an action on a bond of the 25th of August, 1797, and the pleadings were as stated in 7 Cranch [11 U. S.]. The suit was commenced on the 20th of November, 1804. At the trial, the attorney for the United States gave in evidence an account of the United States against Arthur, taken from the books in the supervisor's office, containing the debits and credits of Arthur. The debits, beginning on the 30th of September, 1797, and extending to the 30th of June, 1802, amounted to $30,-584.99½. The credits, beginning on the 30th of June, 1798, and ending on 30th of June, 1802, amounted to $14,403.84, leaving a balance due to the United States of $16,181.15½. There was a deduction afterwards made of an erroneous allowance of commissions, of $970.86; and subsequent allowances of credits received between March, 1804, and July, 1805, of $573.77½. So that the ultimate balance, stated as due to the United States on that account, was $16,578.23½. There was also given in evidence, a separate account drawn off from the supervisor's books, containing the debits and credits of Arthur from the time of his appointment, until he executed a second bond to the United States with Patterson alone, as his security (on the 23d of March, 1799, which was sued, and is the case reported in 7 Cranch [11 U. S.] 575). This account presented on the debit side $9,034.13½, and after deducting the credits, $2,554.23, left a balance due to the United States, of $6,479.90½. The second bond aforesaid was also read in evidence, and also an account drawn off by the supervisor from his general account, as the debits and credits against the said Arthur, after the date of the said bond. In this account the debits up to the 15th of November, 1803, were $21,-550.86, and the balance due, after deducting the credits, was $9,701.24.

The defendants then offered in evidence, the deposition of James Hughes, taken on the 11th of May, 1811, which was objected to as improper evidence, but the objection was overruled by the court. It was as follows: "This deponent says, he did, as attorney for Thomas January, apply to Major Morrison, supervisor in Lexington, at his office, some years ago, the precise time he cannot now recollect, but he is confident it must have been before the judgment entered in the Kentucky district court. In the suit, United States against Arthur & Patterson (i. e. on the second bond), in order to obtain information from the said Morrison re-

specting the said January's responsibility and danger of being made liable, as a security in a bond for John Arthur as collector of excise, bearing date, as appears from the bond, the 25th day of August, 1797. This deponent believes he was requested by January to bring a suit against the said Morrison to compel him either to give up the bond, or give the said January a receipt or discharge against it; and that this deponent wished to understand from the said Morrison, what was the said January's situation before he took any such measure, or whether such measure was necessary. The said Morrison informed the deponent, that John Arthur had paid a sufficient sum to discharge that bond; and that what he had paid should be so applied. This answer was reported to the said January, with which he appeared satisfied; and this deponent was himself of opinion he was safe." · Signed J. Hughes.

The objections stated to the admission of the deposition on the record were, (1) because the said deposition did not go to prove, that the said Arthur had discharged the condition of the bond in suit; (2) because it only went to prove a promise on the part of the supervisor to appropriate the payments, and not an actual appropriation; (3) because it did not appear, that Arthur had given any directions to the supervisor, how to apply his payments, or that the supervisor had ever made his election to appropriate them differently from the account current; (4) because the said Arthur & Patterson were not present and assenting to the arrangement promised to be made by the supervisor; (5) because it was an attempt by bare parol to impeach the words (accounts?) of the supervisor; (6) because the words (accounts?) of the supervisor were the best and only evidence of the application made by the supervisor, and ought not to be impeached or contradicted by a promise of the supervisor to do an act out of the line of his duty, and contrary thereto. But the court overruled the objections, and the deposition was permitted to go to the jury as evidence, for the purpose of showing that the bond was paid and discharged.

The attorney for the United States then introduced Morrison (the supervisor) as a witness, who deposed, "that he had a recollection of James Hughes, calling upon him as the attorney of January, and conversing with him about the bond now sued upon. But that he did not believe, that he had ever told said Hughes, that he would appropriate the payments to the discharge of the bonds upon which the suit is brought. That the payments, which had been made by Arthur, if applied to the bond now sued upon, would discharge it: but that he had never made any other appropriation, as he recollected, than that stated in the accounts above alluded to; although he might have said, and he believed he had frequently told the defendant, January, and others, that the whole of January's bond would be paid off, if the payments that were made by

v. Nicoll, 12 Wheat. [25 U. S.] 505, in which U. S. v. January [supra] is recognized, turned upon entirely distinct considerations.

Arthur were appropriated to the discharge of that bond exclusively; and that he had himself entertained an opinion, that the payments that were made by Arthur, ought to be applied to the payment of the first bond, until that was paid off. But that he had determined to enter the credits as they were made upon the account current, which he had done, and leave it to the law and the court to fix appropriations, when difficulties should arise. That Arthur never gave him any directions about the appropriation of his credits at the time, or before, he became entitled to them, nor until after a suit was brought against him and Patterson upon the last (second) bond; and that then he gave him directions in writing to appropriate certain credits and payments exclusively to the credit of Patterson; but that he refused to do so, leaving it to the court to make the appropriation."

The defendants then called one "James Coleman, formerly a clerk in the supervisor's office, who deposed, that the defendant, January, several times called at the office on the subject of his bond, expressed his uneasiness about its remaining out, and his desire to get it up. That the supervisor assured him, that Arthur had paid enough to discharge that bond, and that he might make himself easy; but refused to give up the bond, because · he thought such bonds ought to remain as vouchers in his office." The record then proceeds: "This being the whole of the testimony delivered on both sides, the attorney for the United States moved the court to instruct the jury, that the election and promise of the supervisor to James Hughes, stated in his deposition. unless the said promise was fulfilled by some act of appropriation of the payments, by the supervisor, was not of itself an appropriation of the payments. But the court overruled the motion of the attorney, and, on motion of the defendants, instructed the jury, that if they believed that the supervisor had made the election and promise, as stated in the deposition of James Hughes, that it was a declaration of his election, how the payments made by Arthur should be applied; and that whether a formal entry in the books, of their appropriation, corresponding with that election, were made or not, was immaterial, and that the jury ought to consider the appropriation as made." To which opinion an exception was taken.

Such is the record; and upon this posture of the case several observations arise to explain the opinion of the court: (1) The cause was submitted without argument; and therefore no points could arise before the court, except such as were apparent on the record. (2) Now upon the record the only points were, first, the admissibility of Hughes's deposition; and, second, the instruction of the court with reference to that deposition. (3) No point was made as to the effect of payments and credits made on general account in an account current between the parties. But the whole cause seems to have proceeded upon the assumption, that but for the special election and promise of the supervisor, the payments made and credited upon general account would not have extinguished the antecedent items of debt. so as to have discharged the first bond on which January was surety. The point not having been made, could not intentionally have been decided by the supreme court. (4) There was no evidence, that in the slightest degree tended to show that Arthur, at or before the time when the payments or credits were made by the supervisor in his books, directed any special appropriation of them; or that he did not intend that they should be placed to general account. On the contrary, Morrison expressly swore, that no such directions had ever been given until long

afterwards, and after the suit was brought on the first bond. And Hughes's testimony, which applies to a period long after all the payments were made, and passed in the account current on general account, only goes to show, that the supervisor at that time elected and promised, that the payments and credits should be applied to the discharge of the antecedent debt; not that he had already so applied them. But the point did arise, whether, when no special appropriation had been made by either party at the time of the payments, but they had been passed to general account, without objection. on the account current, a public officer could, by his subsequent election or promise, change or alter the appropriation from the general account already made. to a special account. Some of the objections taken to the admissibility of Hughes's deposition relate to this point.

If the opinion of the court is examined with reference· to the facts above stated, and the points made on the record, it will at once be seen, that there was no decision made on the point often supposed to have been ruled in this case, viz. that payments made on general account do not (as in common cases) go to extinguish antecedent items of debt according to the order of time, when the account is with a public officer of the United States. The judge, who delivered the opinion of the court, after referring to the rule of law, that the debtor may, if he pleases, at the time direct the application of payments, and if he does not, the creditor may direct it; and if neither does, the law will make the application. proceeded to state, that the majority of the court were of opinion, "that the rule adopted in ordinary cases is not applicable to a case circumstanced as this is, where the receiver is a public officer not interested in the event of the suit, and who receives on account of the United States, where the payments are indiscriminately made, and where sureties under distinct obligations are interested."

If I understand this declaration correctly, it must, with reference to the facts in the case, mean, that where payments have been indiscriminately made, and carried to general account with officers of the United States, the debtor has no right subsequently to direct or alter, the appropriation so made, to any other account or purpose. Neither has the officer acting for the United States a right to assent to or to make such subsequent appropriation. He has no authority to change, on behalf of the United States, the state of any payment as it is first applied on general account. It is then added: "It will be generally admitted, that moneys arising due and collected, subsequently to the execution of the second bond. cannot be applied to the first bond, without manifest injury to the surety on the second bond, and vice versa." I understand this to be no more than an argument from inconvenience; and not an assertion, that all moneys collected subsequently to the second bond are, if passed to general account, to be applied. not to the discharge of the first, but of the second bond. It is then added: "Justice between the different sureties can only be done by reference to the collector's books; and the evidence, which they contain may be supported by parol testimony, if any in possession of the parties interested."

I understand from this declaration, that the books of the collector are to furnish the evidence as to the debits and credits, whether on general account. or on special account or appropriation; and that parol evidence is admissible to support that evidence; but not to contradict it. At least the latter position, if not stated nor implied, is not disaffirmed. The decision was, "that the circuit court erred in the opinion given." That is, that the circuit court erred in

count, where the debtor himself had made no application.

I have had occasion to consider this point in the case of Postmaster General v. Furber, (Me.) 1827, and to the opinion there given I deliberately adhere.[3]

My judgment is, that, as the credits carried into the general account of Bourne, for disbursements since the second bond was given, far exceed those due by him to the United States, the parties to the first bond are discharged from any responsibility thereon. The bill must therefore be dismissed. Bill dismissed accordingly.

instructing the jury, that if they believed, that the supervisor had made the election and promise, as stated in Hughes's deposition, it was a declaration of his election, how the payments of Arthur should be applied, and that whether a formal entry was accordingly made of such appropriation or not, in his books, the jury ought to consider such appropriation as made.

Now this opinion of the circuit court embraces two points: (1) That the supervisor had a right after such payments upon general account, to make a special application of them to the first bond; (2) that his promise to Hughes was an election to make such special application, and amounted without any further act done to an actual application according to his promise. The decision of the supreme court negatives both propositions, and goes no farther. The language of the judge must be construed with reference to them. There is no record of the form of the judgment of reversal, or mandate in this case. In U. S. v. Nicoll, 12 Wheat. [25 U. S.] 505, 511, this case of U. S. v. January, 7 Cranch [11 U. S.] 572, was referred to by the court in its opinion, as in point to show, that as to credits after a second bond given, it was at the election of the government to apply them to either account. This is doubtless true, where the debtor makes no other application at the time of the payments or credits. But if the government carry them to general account, it is presumed, that it was not intended to say, that they could afterwards be altered to a special account, by the government, so as to affect sureties.

3 [In truth the same point was substantially decided by the supreme court in the case of U. S. v. Kirkpatrick, 9 Wheat. [22 U. S.] 720, and further discussion of it would seem to be unnecessary.]

