FERDINAND EMIL WALTHER *v.* SAMUEL WETMORE and JOHN CRYDER.

The plaintiff, in England, consigned certain goods to C. & Co., of London, commission merchants, for sale in New York, through their agent in the latter place, with instructions to procure quick return; at the same time receiving an advance of £200 in money, and acceptances amounting to £300. Afterwards, to obtain an advance of money from P., of London, for their own use, C. & Co. prepared a letter, enclosing bills of lading for the goods in question and other goods, with instructions to R., their agent in New York, to remit the net proceeds to P., sending account sales to *them.* In part consideration of those instructions, and on deposit with him of a copy of the letter as sent, P. advanced to C. & Co. £2,000. By another letter of the same date, one of the firm of C. & Co. instructed their said agent, R., to pay to the defendants, who were P.'s agents, all the cash, and to deliver to them all bills he might hold of theirs, (C. & Co's,) to be held by the defendants for collection, under orders to transmit said cash and the proceeds of the said bills to P. for account of C. & Co.

By still another letter of that date, C. & Co. enclose to their said agent, R., invoices of the goods in question, in which they apprise R. of the amount of their advances

upon the goods, and that they are not owners, and repeat their previous direction as to the proceeds of sale, by referring him to the letter covering the bills of lading.

In a letter also of same date, P. enclosed to R. a copy of his principals' letter of instructions first above referred to; and for his own security desired R.'s acknowledgment of their receipt, and his agreement to conform to the instructions respecting the remittance of the proceeds to *him*.

A few days afterwards, P. requested R. to conform to the directions of the defendants, (the former's agents,) in regard to remitting the proceeds or selling the goods, and directed R. to receive the defendant's orders as from him.

Shortly after receipt of last named letter, R. endorsed to the defendants for account of P., the bills of lading for the goods, which had not yet arrived in New York.

On their arrival, an *agent of plaintiff* demanded them of R., and offered to pay all legal charges and liens. He also, afterwards, demanded the goods of the defendants, and upon a renewal of such demand, offered to pay all advances, expenses and charges, but produced no money. The amount of the advances, &c., on the goods, was unknown to the defendants.

After such demand, the goods were sold by the defendants at auction, and the final net proceeds were $2,288 63, which, but for the plaintiff's claim, they would have remitted to P. In a suit by the plaintiff against the defendants for the value of the goods,

HELD: 1. That the holding of the goods by the defendants was unwarranted. 2. That the acts of C. & Co. and R., their agent, worked a forfeiture of the lien for the advances made by C. & Co. to the plaintiff. 3. That no tender by the plaintiff was necessary to entitle him to maintain the action.

*Held,* also, that there was a transfer of the goods to P., by C. & Co., and their agent, R.; that the defendants' possession was under such transfer, and not lawful as a delegation to them in support of the lien of C. & Co. for their advances, &c., but illegal and fraudulent as against the plaintiff.

The transfer was a pledge by factors of the goods of their principal, to secure advances made to themselves, and as such was illegal, and conferred no right upon the pledgee, (P., or the defendants as his agents,) not even to the extent of the factors' lien.

*It seems* that a factor, to secure advances made to him by a third person, may pledge to such third person, out of the proceeds of the consignment, the amount of his lien, as well for charges and commissions, as for his advances upon the goods of his principal.

The statute in relation to factors and agents, (Laws of 1830, p. 203,) was framed for the regulation of the conduct of factors within our jurisdiction, and for the protection of those having dealings with them here. It has no application to the determination of questions arising upon a pledge in London, by a factor there, although the delivery of the goods pursuant to the contract made in London, be consummated by the agents of the parties in this country. But *it seems*, that under such circumstances, if the similar British statute, from which our own was in part modeled, were before the court, its provisions would control the determination of the cause. Otherwise, the case must be governed by general common law principles.

*It seems*, that when the ownership is known to a party, the law of 1830, before referred to, will not protect his lien for advances made to a factor on the faith of the goods of a principal.

In the absence of directions respecting the appropriation of payments, the creditor has a right to apply them to the earliest items in his account against the debtor.

Where a factor, having a lien, has transferred the goods of his principal to secure advances made to himself by a third person, an offer by the owner, accompanying demand for the goods, to pay all advances, expenses and charges, is not a recognition of the lien of such third person, nor a consent to the transfer to him. The legal effect of such offer depends upon the question, whether any liens exist in law, entitling the possessor to retain the goods.

In an action for damages, where property has been wrongfully converted, the owner is entitled to recover the actual value at the time of the conversion, even though such value has been enhanced by the labor and expenditure of the party illegally withholding the possession.

Accordingly, where goods, when demanded, were on board ship, so that even if released by the party unjustly claiming and exercising possession, they could not have been taken without payment of freight, duties and expenses of landing; *held*, that such party, having refused to comply with the lawful demand of the owner, and continued to hold the goods in defiance of his right, acquired no claim or lien by paying the said charges, and was not entitled thereby to any reduction of the owner's demand in a suit for conversion.

A person who has wrongfully detained goods, and afterwards sold them, has no claim against the owner for storage, insurance or commissions upon the sales. After a demand by the owner, a party in possession of property acts at his own peril, with notice of the owner's claims.

*It seems*, that where the value of the goods is shown by the amount for which they were sold on a credit of some months, interest should be allowed to the owner, not from the time of his demand, but from the maturity of the sales.

THIS was an action to recover the value of twenty two cases of German hosiery, alleged to have been the property of the plaintiff, and wrongfully taken and converted by the defendants to their own use. The facts are fully stated in the opinion.

The cause was tried before Hon. MICHAEL ULSHOEFFER, late one of the judges of the court, without a jury. The court, on the trial, held, that the plaintiff was entitled to recover the value of the goods according to defendants' sale thereof, without deduction, and assessed the damages of the plaintiff at $3,560. From the judgment entered at special term, the defendants appealed.

*Daniel Lord*, for defendants.

The defendants were the agents, in New York, of George Peabody, of London, and acted for him in the transactions now in question, and in the points presented they are so treated. E. G. Roberts was the business man conducting the business in New York, of the firm of Coates & Co., of Liverpool and London.

The goods in question were a shipment of twenty two cases in ship Gladiator, from London, arriving in New York early in December, 1847.

I. The goods were placed by the plaintiff in the hands of Coates & Co., on receiving from them an advance on the 12th October, 1847, of £500. (£200 in cash, £300 in bills dated October 12, 1847, due January 12—15, 1848; all of which were outstanding on the 23d October, and 13th December, 1847.)

1. The goods were on their passage from October 16 to December 13.

2. Coates & Co. were to have the goods sold at public or private sale at New York.

3. At the time, therefore, of the arrival of the goods in New York, in December, 1847, they were subject to a just debt of the plaintiff for £500, and to the charges for freight, duties and expenses, which were then incurred on them in bringing them to market.

II. Coates & Co., on the 23d October, 1847, ordered the *proceeds* of the goods into the hands of the defendants for Peabody, to whom Coates & Co. were largely indebted, and from whom they received subsequent advances to £5,000.

1. These orders were not intended to vary, and did not vary in fact the mode of the sale—they merely placed the *proceeds* in the hands of Peabody, to be accounted for. There was no appropriation of those proceeds by any language or fact, beyond the just lien of Coates & Co.

2. The bills of lading were handed over by Coates & Co. to Peabody for the same purpose, and no other.

3. This was a transfer by Coates & Co. to Peabody, of their

lien, and gave him the benefit of it. It was not a varying of the mode of sale, nor a change or attempt to change the property of the goods in derogation of any right of the plaintiff. It was not a conversion by any one, nor was Peabody's or the defendants' interference tortious, nor a destruction of the just lien to which the goods were subject; but it was a lawful and legal transfer or delegation of it to Peabody. (4 Johns. Rep. 103, *Urquhart* v. *M'Iver.*)

III. The plaintiff fully recognized and consented to this transfer.

1. After the arrival of the goods at New York, after the defendants had received them as agents of Peabody, the plaintiff twice offered to pay " all advances, expenses and charges on the goods."

2. There were no advances but those by Coates & Co., and no expenses but by the defendants, as agents of Peabody. This deliberate offer, made with a view to suit, was a recognition of the lien in the defendants' hands, and a full admission of, and assent to it. It prevented any forfeiture of the just right of Peabody and the defendants to receive from the plaintiff the advances made to him, and the charges incurred.

3. This claim for advances and charges is a just claim, as between Coates & Co. and the plaintiff, and it justly belongs to Peabody, as between him and Coates & Co. The plaintiff recognized it because it was an equitable and just claim.

4. The plaintiff again recognized the transfer in the complaint itself, after full knowledge—he makes it the basis of an equitable claim to an account.

5. The offer was not made by way of compromise or of buying peace, but by way of establishing his claim, and of limiting it so as to avoid the consequence of claiming too much in his suit.

6. This right, thus just, and so fully and solemnly recognized by the plaintiff, ought to have been recognized by the Court; and it was manifest error in the judge to have wholly denied and disregarded it.

IV. The offer of the plaintiff, to have been sufficient as a

tender at law to discharge the lien, should have been made at London.

1. The transactions, in contemplation of both consignor and consignee, took place there, and there the account was to have been settled. The sale was to have been at New York, but the proceeds remitted to London, and there accounted for between Coates & Co. and their representatives, and the plaintiff. A tender there, or an offer there, would have protected the rights of all parties. A tender in New York could not have led to any settlement whatever.

2. Suppose there had been no transfer of the lien, and the offer had been made to Roberts, the agent here for sales of Coates & Co., he could not have settled the account, nor accepted the tender and given up the property; for he had no notice of the amount of lien, nor was it the fault of his principals that he had not. His refusal would not have been a conversion; if it would, then the plaintiff could have discharged his goods by a tender, of which the party to whom it was made could not have judged of the sufficiency, and who, indeed, had no authority to receive it.

3. The offer, therefore, while it was a formal acknowledgment of Peabody's rights to the lien on the property, and a full attornment therein to him, was wholly insufficient as a tender to subject to an action of tort. It was not to a right person; the holders of the goods here were mere agents for sale and remittance to London, and not for settling accounts. It was not of any specific amount. It was not at a proper place, neither the place of the advance or agreed payment. As a tender at law, it had every incompleteness, and was wholly nugatory.

4. As an equitable offer alone could it be available, to entitle the plaintiff to an equitable accounting to the equitable consideration of the court, as any offer to do equity would operate. But such offers the party cannot retreat from; by making them, he gives as well as gets advantages. He is bound by them to do what he has, in a sense of justice or of interest, offered to do, and submit to the equity he has recognized.

5. The offer proved was therefore insufficient to render the holding of the goods, and the executing of the purpose of the consignment by a sale, tortious or unwarranted—as was erroneously held by the judge.

V. But even if entitled to recover, the plaintiff's claim should have been allowed, only subject to the advances and charges.

1. These he had actually received, as an anticipation of the sales, or as expenses which must have been paid by him to procure the property and its sale. It is vindictive, and not just, that he should receive the sales of the goods twice, or without bearing the just expenses on the goods. His property in the goods was diminished to the extent of these just and equitable burdens. He had recognized Peabody's right to them; and even if the latter were liable, by reason of claiming for too much, or rejecting a tender, yet to avoid injustice and circuity of action, he should have been allowed the advances and charges on the goods. The charges are such as any one must have paid to have obtained the goods; they entered into their intrinsic value at New York; at the time of the demand, the £300 bills were outstanding, not matured nor taken up by the plaintiff. And yet, most inequitably and unjustly, the recovery was for the full gross sales, without any deduction.

In this, also, the judge erred.

(See *Ingersoll* v. *Van Bokkelin*, as to the rule of damages; 7 Cowen R., 681, and note thereto.

*S. B. Helbert Judah*, for plaintiff.

The judge has correctly decided,

I. That the plaintiff in this cause was the lawful owner of the goods, and had the general property therein, and that the defendants unlawfully converted the same. (11 Wend. R. 54.)

II. That the transfer of the plaintiff's goods, and subsequent disposition thereof, was a conversion of the goods; and under the facts and pleadings, they were no longer subject to any

lien for the advances, and the lien was not transferred. (2 Kent's Com. 1st edition, 434, 5, 6; 2 John. C. 327; 14 John. R. 128; 18 John. R. 24; 20 John. R. 421; 26 Wend. R. 377; 2 Hill, 152; 6 Hill, 513; 3 Denio, 473; Laws of 1830, p. 203.)

III. That in the defendants' hands the goods were not subject to any lien under the circumstances of the case for the charges paid by the defendants, or deducted from the sales, defendants' possession being unwarranted, and that the defendants were bound to deliver up the goods on demand.

By THE COURT. WOODRUFF, J.—The principles of law, by which the rights of the parties are governed in this action, are the same as would have prevailed in the action of trover, under our former practice. I perceive nothing in the pleadings, nor in the arguments of counsel, which is founded upon any supposed *equity* between the parties, or appeals to the jurisdiction of this court as a court of equity. And probably there is no question in the case to which the principles peculiar to a court of equity are applicable, although at first view I was inclined to think that if the plaintiff is entitled to recover, there might be some considerations purely equitable which should regulate the damages in such a case.

The material facts in the case may be thus stated: The plaintiff consigned the goods in question to Coates & Co., of London, commission merchants, on the 12th Oct., 1847, (invoice dated 5th,) for sale in New York, through their agent here, and with instructions to sell them at public or private sale, and procure quick return; at the same time receiving an advance of £200 in money, and shortly thereafter two acceptances amounting to £300. Coates & Co. thus became the plaintiff's factors, authorized to sell through their agent, in his or their discretion, in either of the modes prescribed by the instructions—and having an interest in the goods to the extent of their advances, and a lien thereon for the amount of such advances, with the expenses and charges of shipment and sale in New York, together with the usual commissions,

Walther v. Wetmore.

and an "extra commission" of 2½ per cent., stipulated in their favor by the terms of the consignment. Upon these facts alone, it is conceded on all hands, that so long as Coates & Co. in good faith proceeded to execute the commission with which they were charged, the plaintiff could not control nor lawfully demand the goods, without paying or sufficiently tendering to his consignees the whole amount advanced, (either in money or the acceptances if unpaid,) with all charges and the commissions earned, or which they had a vested right to demand if the plaintiff withdrew the consignment.

On the 23d of October, for the purpose of raising money for their own use, and intending to obtain an advance from George Peabody, of London, Coates & Co. prepared a letter, enclosing bills of lading for the goods in question and other goods, with instructions to their agent in New York, (Roberts,) to remit the net proceeds to George Peabody, sending account sales to *them*. This letter was exhibited by Coates & Co. to Peabody, and in part consideration of those instructions, and on the deposit with him of the duplicate or copy of the letter, Peabody, on the 30th day of October, advanced to Coates & Co. £2,000.

By another letter of the same date, (23d Oct.,) E. J. Coates, one of the firm of Coates & Co., instructed their agent, Roberts, to pay to the defendants in this suit, (who were agents for Peabody,) all cash, and to deliver to them all bills he might hold of theirs, (Coates & Co's.) to be held by the defendants for collection, under orders to transmit the proceeds to Peabody for account of C. & Co.

By still another letter of 23d Oct., Coates & Co. enclose to Roberts *invoices* of the goods in question, in which they apprise Roberts of the amount of their advances upon these goods, and in substance, that they are not *owners*, and they then repeat their previous direction as to the proceeds of sales, by referring him to the letter covering the bills of lading above referred to.

By letter of the same date, 23d October, Peabody enclosed to Roberts, his principals' letter of instructions of that date,

enclosing the *bills of lading* of the goods in question, and other goods, and for his own security, desired of Roberts his acknowledgment of their receipt, and his agreement to conform to the instructions respecting the remittance of the proceeds to *him.*

On the 3d of November, Peabody, by letter of that date, requested Roberts to conform to the directions of the defendants, (his agents,) in regard to remitting the proceeds or *selling the goods*, receiving the defendants' orders " the same as though they came direct from him." (This letter was apparently preceded by a telegraphic dispatch from Peabody to the defendants, dated November 2d, 1847, urging them to obtain from Roberts a transfer of the *bills* directed to be delivered to them by Coates' letter, above mentioned, which dispatch does not refer in terms to the goods in question, but was calculated to stimulate the defendants to activity in protecting Peabody's interest.)

Very shortly after the receipt of the last named letter, to wit, on the 18th or 19th November, Roberts endorsed to the defendants, for account of Peabody, the bills of lading for the goods in question, which had not yet arrived here ; thus giving up the whole control of the goods and the direction of the sales to them as Peabody's agents.

The goods arrived in New York in December, and on their arrival, the plaintiff's agent demanded from Roberts the goods in question on behalf of the plaintiff, and offered to pay all legal charges and liens ; to which demand Roberts answered that he could do nothing about it.

On the 11th December, the plaintiff's agent called upon the defendants and demanded the goods. The defendants refused to give any information respecting the goods, denying that any goods had been sent by Coates & Co., and said they did not know Coates & Co. Again, on the 13th December, plaintiff's agent renewed his demand, and offered to pay all advances, expenses and charges on the goods. The de-defendant, Cryder, replied, that his *firm* had made no advances ; that he did not know what advances had been made,

and refused to deliver up the goods, but admitted that the goods had been received by them, and that they had the goods. At this interview, no money was produced. The witness making the offer had no money, and did not know the amount. And it is equally clear upon the evidence, that the defendants had no knowledge, nor means of knowledge of the amount, except to the extent of the charges contained in the invoices referred to in Peabody's letter, and possibly the freight to be paid according to the tenor of the bills of lading indorsed to them.

It appears by the account of the defendants, that the duties on the goods, and the freight and cartage, were not charged until the 14th and 17th December, which were after the above demand, although at the time of such demand the defendants admitted the goods had been received, and that they then had them; whether they had been landed or not, does not otherwise appear.

This somewhat minute statement embraces all the facts which appear to be material to exhibit the relations of the parties and their respective claims to the goods in question, though after the advance made by Peabody of the £2,000, on the 30th of October, various amounts were received by him from Coates & Co., or for their account, from the securities received pursuant to the foregoing instructions. But as no specific appropriation was made by the debtors of these payments to the advance of £2,000, made on the 30th October, in part reliance on the proceeds of these goods, I apprehend that fact is not material, since the whole £2,000, and much more, appear to remain still due to him. Indeed, the whole tenor of the transactions between him and Coates & Co. imports that these payments are upon his previous advances, appearing in their general account, in which they were largely indebted to him. And at all events, if no directions were given by the debtors respecting the appropriation, he had a right to apply them to his *earliest* advances.

(*Thompson* v. *Brown*, Moody & Malkin, 40; *McKenzie* v. *Nevins*, 9 Shepley's (Maine R.) 138; *Wilson* v. *Hurst*, 1 Ne-

vile & Manning, 746; *Brigham* v. *Alton*, 9 Watts, 386; *United States* v. *Kirkpatrick*, 9 Wheat. 720; *Same* v. *Wardwell*, 5 Mason, 82.)

The additional fact that Coates & Company subsequently became bankrupt, on the 24th December, leaving their acceptances for £300, held by the plaintiff, unpaid; and that the plaintiff subsequently, on the trial of this cause, produced those acceptances, and offered to give them up to the defendants, if material in any aspect, are not so under the conclusions to which I have arrived.

After the foregoing demand, the defendants sold the goods in parcels at public sale, "in the usual way," on a credit of six months; and it is testified that the goods brought their fair value, and that the charges in the auctioneer's account sales are the usual charges; and the net proceeds received by the defendants were $3,255 40. Their own claims as consignees or agents for duties, freight charges and commissions, amount to $966 77, leaving of final net proceeds in their hands, $2,288 63, which, if no claim on behalf of plaintiff had intervened, they would doubtless have remitted to Peabody.

After these sales were closed, and on the 6th July, 1848, this suit was brought, and on trial by the court judgment was given for the plaintiff for $3,560.

In the opinion of the court, at special term, assigning reasons for the decision there made, it is stated that a copy of the plaintiff's invoice to Coates & Company was given to Peabody, and the latter knew, therefore, that the goods belonged to Walther, (the plaintiff,) and that in dealing with Coates & Co. he was not dealing with the owner of the goods. That Peabody and the defendants knew that the goods belonged to the plaintiff. And the court seems to rely much upon this fact for the conclusion, that the transfer of the goods by Coates & Company, and Roberts, their agent, was not only a fraud upon the plaintiff, on their part, but made the arrangement between Peabody and Coates & Co. fraudulent on his part, and the receipt and sale of the goods by the defendants a tortious conversion.

I find no such state of things proved; nor that Peabody

Walther v. Wetmore.

was in any manner apprised, when his advance was made, or afterwards, that the plaintiff had any interest in the goods whatever.

The evidence of Coates is, that he, by letter of the 23d October, instructed Roberts to pay over the proceeds of the goods in question to Peabody, and a few days after handed to Peabody a copy or duplicate of the letter, but *no other documents whatever relating* to the said goods or securities; and that upon the deposit of that duplicate he obtained the advance. This letter contains no intimation that any other person than Coates & Co. had any interest in the goods. And it appears by Roberts' deposition, that the *bills of lading* and not the invoices were enclosed in that letter; in accordance with which testimony, we find the letter of Peabody of the same date, to Roberts, enclosing the letter of Coates & Co., which covered the *bills of lading*. And as to the plaintiff's invoice to Coates & Co., so far from its being proved that Peabody ever saw it, or any copy of it, the only evidence of its disposition is Coates' testimony, where he uses, in regard to it, this language: "which invoice witness and his said partner *retained* in the usual way, making out a fresh invoice with the shipping charges added."

It may, perhaps, be said that this question is rendered doubtful by the fact that Peabody in his letter to Roberts, of the 3d of November, says, he has transmitted to the defendants copies of these fresh invoices; and if they contained any recognition of plaintiff's interest, Peabody must have learned it as early as the date of his letter, and it was also known to the defendants when they received the transfer of the bills of lading, and when they took possession of the goods. But there is no accurate copy of these invoices in the case. The exhibit marked E., called by Roberts a copy of the plaintiff's invoice, with the addition of the shipping commission and charges, is clearly not to be relied on as a copy of the invoices referred to in Peabody's letter. It is obviously made for some purpose connected with the proceedings in Coates' bankruptcy. It is referred to in his account with plaintiff, which precedes it. It was made in or after *February*, 1848, and

purports to be like the invoice, so far that it is merchandise, (said to be in hands of Roberts, 1st February, 1848,) "being the *same goods* contained in our invoice of the 5th Oct., 1847," &c. So that there still appears to me no sufficient proof that either Peabody or the defendants were apprised that the plaintiff had any interest in the goods, until the plaintiff's agent made his demand upon the defendants in this city, in December; and Coates, as I have before observed, positively states, that when the advance was made, no paper or document was handed to Peabody, but the letter which enclosed the bills of lading, so that if exhibit E. was in fact a true copy of the invoice accompanying the goods, (having only the caption altered,) the copy thereof was obtained by Peabody after his advance was made.

I have noticed this state of the proofs thus particularly because, in the opinion of the court at special term, this one fact (Peabody's knowledge of plaintiff's ownership) was deemed to take the case out of the operation of our statute in relation to factors and agents, and to give to the transaction the aspect of intentional fraud. (Laws of 1830, chap. 179, p. 203, &c., § 3.) The conclusion was undoubtedly correct, if the facts assumed were true, and so it was settled by the court of errors in *Stevens* v. *Wilson*, 3 Denio, 473. I apprehend, however, that our statute has no application to this case. That was framed for the regulation of the conduct of factors within our jurisdiction, and for the protection of those who dealt with them here, and not for the determination of questions arising upon a pledge in London, by a factor there, although the delivery of the goods, under or in pursuance of the contract made in London, may have been consummated by the agents of the parties in this country.

The similar British statute, from which our own was in part modeled, is not before us; if it were, the question which I have above discussed would be vital to the determination of the cause. As it is, we are left to general common law principles, and the first inquiry is, was there a transfer of the *goods* to Peabody?

There was first a direction, founded upon a sufficient consideration as between him and Coates & Co., to remit to him the entire proceeds; and after that arrangement, it is difficult to say that Coates & Co. could have interfered further against his will, or exercised any discretion not concurred in by him, regarding the sale or disposition of the goods, while on the other hand *he* clearly had no right to give any directions or do any act which altered or modified (without the consent of Coates & Co.) the instructions of Coates & Co. to Roberts, touching the sale of the goods upon which the advance by him was made.

And had the property remained in Roberts' hands for sale, pursuant to his instructions, and in conformity with the original directions of the plaintiff as to sales, it is doubtful, at least, whether the transaction could have been deemed a transfer of the goods. It may have been a breach of trust, or an attempted misappropriation of the plaintiff's money, but his consignment would in all respects have gone to its destination agreeably to the terms of his consignment.

But the defendants, either with or without the authority of Peabody, received an assignment of the bills of lading, and took possession of the goods. Here, then, was formal transfer of the goods for the ostensible benefit of Peabody. If the defendants now disavow the transfer, they cannot defend their possession. If the arrangement between Peabody and Coates & Co. was not a transfer of the goods, and the acts of Roberts here, and the taking of the goods and selling them in virtue thereof, did not constitute a *transfer in fact*, then they could not defend their own possession, without showing that they were, in this respect, *agents of Coates & Co.*, and acted as such.

But the acts of the defendants, in the whole transaction, in my judgment, forbid them now to say it was no transfer. Peabody assumed, as early as 3d November, to direct Roberts to conform to the defendants' orders, not only in regard to remitting the proceeds, but also in regard to selling the goods; and immediately after the receipt of this letter, the defendants took an assignment of the bills of lading, and assumed the whole control of the goods for the benefit of Peabody.

The defendants, however, insist that the arrangement for remitting the proceeds to London, and the subsequent assignment of the bills of lading, merely placed the proceeds in Peabody's hands *to be accounted for*. That there was no appropriation of the proceeds beyond the amount of the lien of Coates & Co.

In the first place, Coates & Co. had no greater or other right to place the proceeds of the plaintiff's goods in the hands of Peabody, than they had so to place the goods themselves. They had no authority to constitute Peabody the accounting party with the plaintiff, and the plaintiff could not, without his assent, be required to treat him as such. Nor is it true that there was no appropriation of the proceeds beyond the amount of the lien of Coates & Co. If there was any appropriation of one dollar, there was an appropriation of the *whole ;* the terms used were unqualified, and embraced the whole proceeds as truly as any portion of them. And it cannot be for a moment doubted, that had the whole proceeds been received by Peabody, he would, as against Coates & Co., have had a clear right to apply the whole of them, in repayment of the £2,000, not as a *set-off* merely, but according to the very meaning and intent of the agreement between them.

Coates & Co. might undoubtedly have directed their agent to remit to Peabody, out of the proceeds, the whole amount of their lien, as well for charges and commissions as for their advances ; and had they done so, it would have been no violation of their duty as factors. This they might easily have done, but did not attempt ; they did not (according to the views I have above taken of the evidence) even disclose to him the fact that they were not sole owners of the goods. And if I am wrong in this, they manifested, and, as I think, expressed as clearly as could be expressed, an intention to appropriate the *whole proceeds* to his reimbursement. The assumption by Peabody to commit the direction of the sales to the defendants, and the defendants' acts importing, on his behalf, unqualified ownership, proceed upon the ground that he was entitled to the *whole*. And the witness, Coates, who himself made the

Walther v. Wetmore.

negotiation with Peabody, avows, that in that negotiation, he *transferred the goods*, considering that his firm had a *perfect right* and full authority to *deal with the goods as they thought proper*, and disposed of them accordingly.

If I could perceive in these transactions the mere delegation to Peabody of the right to receive the amount of the lien of Coates & Co., on their behalf, even although it had been accompanied with the possession of the goods for the purpose of securing and carrying out the object of the original consignment, in subordination to the continued authority of the factors themselves over such possession, and over the sales to be made for the plaintiff's benefit; or if the defendants in this case had shown that they were acting as agents of Coates & Co., and under their direction to carry out the purposes of the original consignment, and protect the lien of Coates & Co., and that they acted only as such agents, I should think the defendants' claim to the extent of such lien entitled them to be protected, although the ulterior purpose was to give to Peabody the benefit of the proceeds of such lien. The shipment of the goods to Roberts was, in every sense, right and proper. He was the agent of Coates & Co. His posssession was their possession. He held for the purposes of the consignment, and to protect their lien, and what is, I apprehend, upon common law principles, essential to every lawful transfer of possession by a factor, or delegation of his lien to another, he was always, in respect to these goods, under their control and direction.

The case of *Urquhart* v. *M'Iver*, in 4 Johns. Rep. 103, was decided upon principles sustaining the above views. Ch. J. Kent says, in that case, "A factor may deliver possession of goods, on which he has a lien, to a third person, with *notice of the lien*, and with a *declaration*, that the transfer is to such person as *agent* of the factor and for his benefit. This is in effect a continuance of the factor's possession." The case of *McCombie* v. *Davis*, 7 East, 5, which was relied upon in support of the views of a majority of the court, goes to this extent, where a factor, with intent to give security to a third person, to *the extent of his lien*, delivers to him the possession, with

*notice of his lien*, and appoints such person to keep possession for him, as his servant, the lien is preserved.

But the later English cases qualify the rule, in the last case, so far, as, in substance, to hold that the factor may not permit another to hold the goods, under any delegation of authority whatever, so as to establish any privity between such other person and the consignor, or confer any right upon *him*, to commissions or lien. (Vide *Sally* v. *Rathbone*, 2 Maule & Selw. 298; Cross on Lien, 264, and cases cited.)

And in this state, by a recent decision, 26 Wend. 467, *McFarland* v. *Wheeler*, the distinction I have taken is recognized, viz., that although, for the convenience of both parties, bailee and owner, the goods are placed in the possession of a third person, yet, in order to preserve the lien, such third person must be under the authority of the bailee or party having the lien.

Neither the defendants in this case, nor Peabody, can, under the facts proved, have supposed they were acting as agents of Coates & Co., and in subordination to their authority. On the contrary, the defendants, according to the evidence of one of plaintiff's witnesses, long after the assignment to them of the bills of lading, and after they must have received a copy of Coates & Co.'s invoices to Roberts, in express terms denied that "any goods had been sent by Coates & Co.," and said "he did not know Coates & Co."

I am therefore constrained to conclude, upon the whole case, as disclosed by the evidence, as well as by the principles to which I have adverted, that the defendants' possession was under a transfer by Coates & Co., and their agent, Roberts, not lawful as a delegation to them in support of the lien, but illegal and fraudulent as against the plaintiff, upon principles once supposed by the courts to be founded in commercial policy, however honest the intentions of all parties may have been.

It was, then, a pledge by the factor of the goods of his principal, to secure advances made to himself. It is unnecessary, at this day, to refer to numerous authorities, to show that such a pledge is illegal, and confers no right upon the pledgee,

not even to the extent of the factor's lien; nor do I understand the defendants' counsel to deny this general principle.

From the decision of *Peterson* v. *Fash*, 2 Strange, 1178, by Ch. J. Lee, with the concurrence of Butler and Grose, justices, the course of decision in England was almost uniformly to this purport, until the passage of the act of parliament (4 Geo. IV. c. 83) to which I have alluded; and in this state the decisions have not been less uniform. (*Godine* v. *Lond. Assurance Co.* 1 Burr. 493; *Daubigny* v. *Duval*, 5 T. R. 604; *Smith* v. *Burrage*, 4 Taunt. 684; *Sweet* v. *Pym*, 1 East, 4; *Sickbarron* v. *Mason*, 6 East, 22, 3 and 4; *Newsom* v. *Thornton*, 6 East, 16; and see numerous authorities collected in Cross on Lien, p. 263, and onward, and in the notes; *Kennedy* v. *Strong*, 14 J. R. 129; *Tolland* v. *Murray*, 18 J. R. 24; *Buckley* v. *Packard*, 20 J. R. 421; *Saltus* v. *Everett*, 15 Wend. 475; S. C. 20 Wend. 267; *McFarland* v. *Wheeler*, 26 Wend. 467; *Stevens* v. *Wilson*, 3 Denio, 473; *Kinder* v. *Shaw*, 2 Mass. 398; and see Story on Agency, § 78, and notes; § 113, and notes; 2 Kent's Comm. 4th edit. 625 and 6, &c.)

It was at one time doubted whether the owner must not tender the amount of the lien before he could maintain an action for the goods; and in *Daubigny* v. *Duval*, 5 T. R. 604, a tender was in fact made to the *factor* of the amount of his advance, and Lord Kenyon thought the tender should have been made to the pawnee. But it is now fully settled that the lien is lost by the transfer, and no tender is necessary.

Indeed, in the case of *Fielding, &c.* v. *Kymer*, 2 Brod. & Bing. 639, which is in every material circumstance most strikingly like the present case, the pawnee having sold the goods, was not permitted, when sued by the owners, to deduct from the proceeds of sale the amount of the factor's advance to the owner; and there the court held, that the debt which, though the lien was gone, remained due from the owner to the factors, belonged to their assignees in bankruptcy, and not to the pawnee. If that authority be followed, the amount due to Coates & Co. by the present plaintiff for advances, charges, &c., belongs to their assignees in bankruptcy, and not to Peabody, nor to the defendants, for his use.

Without, however, attempting to determine whether Peabody or the assignees of Coates & Co. are to be regarded as the assignee of the debt which may be due from the plaintiff to Coates & Co.; (because, whichsoever may be entitled to that debt, its existence or nonpayment did not authorize the defendants to detain the goods when demanded by the plaintiff; and also, because the defendants have at no time, either before suit nor in their answer to the complaint, rested their claim upon any such grounds;) I am forced to the conclusions—

That the holding of the goods by the defendants was unwarranted.

That the acts of Coates & Co., and Roberts, their agent, worked a forfeiture of the lien for advances, &c.

That no tender by the plaintiff was necessary to entitle him to maintain this action.

The next question raised by the defendants' points is, did the court, at special term, err in ruling that the offer to the defendants to pay all advances, expenses and charges, was not a recognition of the lien and consent to the transfer? I think not; a general offer of this kind would never be held to amount to more than a declaration of a readiness to pay whatever legal or equitable claim the party has for such advances, expenses and charges; and where none such exist, the party should accept the offer, if he wishes to avail himself of it for any purpose, and not refuse unqualifiedly to deliver up the goods upon *any* terms. And it is on this point, also, to be borne in mind, that in their whole conduct the defendants disavowed any holding as the representatives of Coates & Co., or as entitled to the amount of his lien only. And if the defendants' position is true, that this offer was a recognition of the lien, which lien did it recognize as then subsisting, the lien of Coates & Co., for their advances, &c., or the lien of Peabody, for his advances? The former was lost by the transfer; the latter, as *against* Coates & Co., was still subsisting.

The offer stated in the answer to have been made, is expressly

Walther v. Wetmore.

confined to such legal and fair charges, liens or expenses, which the *defendants* might lawfully demand, and certainly this admission of the previous offer, stated in somewhat more restricted terms, could have no greater effect than the previous offer itself, and I am clearly of opinion that its meaning and legal effect depended entirely upon the question, whether any lawful and just liens existed, entitling the defendants to retain the goods.

The only remaining question is, did the court err in refusing to allow any part of the charges, freight, duties and other expenses, paid by the defendants, or their commissions on the proceeds?

The rule of damages adopted was the value of the goods. That this was the correct rule admits of no doubt.

Another principle is equally well settled, that one has no right to make payments for another against the will of the latter, and then call upon him to refund. A suit could not be maintained by the defendants for voluntary payments made by them without the plaintiff's request, either express or implied.

The question in this case was, simply, what was the value of the goods? When first demanded, they were on board ship, liable for *freight*, liable for *duties*, subject of *necessity* to the expenses of *landing* and *sale*, and it is plausibly argued, that neither the plaintiff nor any one else could obtain and convert them without paying all these expenses; that the most ready acquiescence of the defendants and compliance with the plaintiff's demands, could not have relieved him therefrom; and that the goods were not therefore worth to him, nor to any one else, any more than they would bring over and above those necessary charges.

But the plaintiff might have replevied the goods at any time after they came to the defendants' possession; his right to the possession was perfect as against the defendants when the first demand was made, and although if they had yielded to that demand, he could not have taken the goods from on board ship without paying the freight, and could not have landed them

without paying duties, THEY acquired no right by paying these charges against his will; they refused to comply with his lawful demand, and set him at defiance. Such payment gave them no lien, for their very possession, after his demand, was wrongful, and the plaintiff might at any moment have replevied the goods themselves down to the moment of sale. (See Cross on Lien, p. 39, [32,] cites *Lempriere* v. *Pasley*, 2 T. R. 485; *Stone* v. *Langwood*, 1 Str. 651, and cases cited in note *b*.) The defendants, in consummating the wrong, added somewhat to the value of the goods by contribution of their moneys. But this gave them no interest in the goods, nor any right to retain the possession. So long as the plaintiff could identify his property, he might claim its delivery or recover its value, and the defendants, by mixing their own property with his, by the payments which they made, did not impair his right to recover the goods themselves, or their enhanced value.

At the time of the second demand the defendants had the actual possession of the goods, by their own admission. Their possession was without right, and they subsequently converted them by an actual sale. At the time of such second demand they did not pretend to hold the goods under a lien of any kind, either for payment of duties, charges or otherwise. They did not rest their claim upon any such ground, but asserted an absolute right to the goods, refusing to recognize the plaintiff as owner, or interested in any manner therein. They made these payments in their own wrong.

If one wrongfully, and against my will, add value to my property by his labor or expenditure, the enhanced value is mine as much as the property itself, and either the property, specifically, or the value thus increased, may be recovered from him.

The cases of *Curtis* v. *Grant*, 6 Johns. R. 168, (where wood was wrongfully taken and converted into coal;) *Babcock* v. *Gill*, 10 Johns. 287, (where black salts were converted into pearl ashes;) *Brown* v. *Saw*, 7 Cow. 95, and *Baker* v. *Wheeler*, 8 Wend. 505, (where in both cases logs wrongfully taken were converted into boards;) in each of which the plaintiff was held entitled to recover the enhanced value of the property,

Walther v. Wetmore.

although such enhancement was the result of the labor or expense bestowed upon the property by the defendant;—all sustain the views above expressed on this point.

As to commissions, storage and insurance, there can be no question. They in no sense formed part of the value of the goods. As against the plaintiff, he having a right to the possession, the defendants had no right to take upon themselves the duty of making sales, or charge him for services therein, as commissions or otherwise. And having such right of immediate possession, the plaintiff had an option to sell at once, or store the goods, and it would be manifest injustice to allow the defendants acting in their own wrong, and in defiance of his right, to deprive him of his option, store and insure the goods, and charge the expenses to him.

The actual expenses of sale appear to have been allowed to the defendants in mitigation of damages, by being charged in the auctioneer's account of sales, which was taken as the basis of estimating the damages. The plaintiff had a right to treat the sale of the goods as the actual conversion by the defendants, and recover the value at the time of such conversion.

However fair and upright the conduct of the defendants was, in their connection with these transactions down to the time of the plaintiff's demand, and however upright their intentions in what they subsequently did; they acted in the matter after that time with notice of the plaintiff's claims, and at their peril.

The goods were sold at a credit of six months, and yet the court appears to have allowed interest from the time of the *demand*, after giving the value, enhanced as it was by the defendants' payments. It seems to me that, after estimating the value, in accordance with the principles I have stated, interest should only have been allowed from the maturity of the sales; for the evidence only proved the value on a credit of that period; but this point does not appear to have been discussed on the trial, and it has not been urged here as a ground of objection to the judgment appealed from. I am not, therefore, disposed to disturb the judgment upon this ground.

The judgment must be affirmed.