## McFarland v. Wheeler and others.

A party having a *lien* upon goods, loses it when he parts with the *possession* of the property.

It was accordingly held in this case, where the owners of a saw-mill permitted boards sawed by them at a stipulated price, to be removed from their mill-yard to the bank of a canal at the distance of half a mile from the mill, that they lost their *lien* in respect to third persons; although it was expressly stipulated between the parties that the lien should continue notwithstanding the removal.

*It seems,* had the boards, after their removal, been placed under the control of a third person, with notice of the lien, that the claim of the mill owners would have been protected.

*It seems also,* that where a portion of the boards are delivered without requiring payment for their sawing, and the mill owners retain either *actual* or *constructive* possession of the residue, that they may enforce their *lien* for the *whole work done* against the portion left in their possession.

ERROR from the Supreme Court. Wheeler and others brought an action of *replevin* in the Washington common pleas, against McFarland for taking a quantity of boards, which they as the owners of a saw-mill had sawed for one Vaughan. It was agreed they should receive $2.-25 per one hundred pieces, and have a lien upon the same until paid. It was farther agreed, that Vaughan might pile the boards on the bank of the Champlain canal, about half a mile from the mill-yard, the plaintiff's lien for sawing, however, to remain the same as if the lumber was piled in the mill-yard; the expenses of the removal to be borne by Vaughan and the ground for piling to be procured by him. The plaintiffs sawed about fourteen thousand pieces. Vaughan took away a boat load of the lumber from the canal bank with the assent of the plaintiffs, and afterwards took away two other boat loads without their knowledge or assent. A deputy of the defendant, who was sheriff of the county of Washington, levied upon the lumber remaining upon the bank of the canal, in quantity about eight thousand pieces, by virtue of an execution against Vaughan, and advertised it for sale. On the day

of sale, the deputy was informed that the plaintiffs claimed to have a lien upon the property to the amount of $350, for the sawing of the whole quantity of fourteen thousand pieces, (and which was proved to remain unpaid,) to which the deputy answered that he would not regard the claim, but would sell the property. Whereupon the property was taken out of his possession by virtue of a writ of replevin sued out by the plaintiffs. It was proved that there was no agreement that the lien for sawing the *lumber taken away*, should be transferred to the boards which *remained*. The defendant objected to the declarations of the deputy as evidence, without the production of the execution: which objection was overruled by the court. He also offered to prove by the deputy that the levy was made only on the *residuary interest* of Vaughan in the boards, subject to the plaintiffs' lien, and that the deputy would so have announced the fact at the sale, and sold accordingly: the plaintiffs objected to the competency of the witness, and the court sustained the objection. The court charged the jury, that though the boards were neither removed or sold by the deputy, a sufficient *taking* had been shown to sustain the action; that the *lien* of the plaintiffs continued notwithstanding the removal of the boards from the mill-yard to the bank of the canal: that the boards which remained on the bank of the canal were subject to the plaintiffs' lien for the sawing of *all the boards and lath*, including those which had been removed as well with as without the plaintiffs' assent. The jury found a verdict for the plaintiffs, upon which judgment was entered. The defendant having excepted to the various decisions and charge of the court, sued out a writ of error removing the record into the supreme court, where, in July term, 1837, the judgment of the common pleas was affirmed: the supreme court holding that the common pleas correctly decided that the admissions of the deputy were competent evidence against his principal, without the production of the execution, and that the deputy was not a competent witness for

his principal. As it regards the *exceptions to the charge*, the supreme court conceiving that all the questions presented by them had been examined and disposed of, when this cause was before them upon a former occasion, and when a *venire de novo* was awarded, merely adverted to and confirmed the decision then made. *See* 10 *Wend.* 318. · The defendant thereupon removed the record into this court, where the cause was argued by:

*M. T. Reynolds,* for the plaintiff in error.

*S. Stevens,* for the defendants in error.

*Points submitted and argued for the plaintiff in error:*

I. The proof of the agency of the deputy was not sufficient to charge the defendant. *Foster* v. *Trull,* 12 *Johns. R.* 456. *Welland Co.* v. *Hathaway,* 8 *Wendell* 480. *McIntyre* v. *Trumbull,* 7 *Johns. R.* 35. *Gorham* v. *Gale,* 7 *Cowen* 740. 4 *Harris & McHenry* 65. *People* v. *Dunning,* 1 *Wendell* 16. 2 *Mass. Reps.* 60. *Utica Ins. Co.* v. *Badger,* 3 *Wendell* 102.

II. The deputy was a competent witness, and his evidence should not have been excluded. *Webb* v. *Alexander,* 7 *Wendell* 281. *Mackey* v. *Rhinelander,* 1 *Johns. cases,* 408 *and* 410. *Burlingham* v. *Dyer,* 2 *Johns. cases* 189. 1 *Phillipps Ev.* 100. 2 *Id.* 45. *Paley on Agency* 279. *U. S. Bank* v. *Stearns,* 15 *Wendell* 316. *Murray* v. *Carrot,* 3 *Call's Rep.* 323. *Alexander* v. *Emerson,* 2 *Littell's Rep.* 25. *O'Brien* v. *Lou. Bank,* 5 *Martin's Rep.* 306. *U. S. Bank* v. *Johnson, Id.* 310. 1 *Cowen and Hill's Notes, p.* 92, *n.* 88, *p.* 97, *n.* 89. *Fisher* v. *Willard,* 13. *Mass. Rep.* 380. *Bailey* v. *Ogden,* 3 *Johns. R.* 394. *Sewall* v. *Fitch,* 8 *Cowen* 215. *Whiting* v. *Bradley,* 2 *New-Hamp. Rep.* 79. *Phelps* v. *Sinclair, Id.* 554. *Shephard* v. *Palmer,* 6 *Conn. R.* 95. *Jones* v. *Hake,* 2 *Johns. Cases* 60. *Doe* v. *Hinelick,* 4 *Blackford* 485. 1 *Starkie Ev.* 120. *Thomas* v. *Gamwell,* 6 *Leigh's Rep.* 16. *Alderman* v. *Tirwell,* 8 *Johns. Rep.* 418.

*Smith* v. *White*, 5 *Dana* 382. *Barretto* v. *Snowden*, 5 *Wendell* 186. *Stewart* v. *Kip*, 5 *Johns. R.* 256. *Schmidt* v. *Webb*, 9 *Wendell* 268.

III. There was not such a conversion as to sustain the action. *Haggerty* v. *Wilbur*, 16 *Johns. R.* 287. *Messereau* v. *Norton*, 15 *Id.* 179. *Dillenback* v. *Jerome*, &c., 7 *Cowen* 294. *Broughton* v. *Whallon*, 8 *Wendell* 474. *Parker* v. *Walrod*, 16 *Wendell* 514. *Gates* v. *Bushnell*, 9 *Conn. Rep.* 530. *Parsons* v. *Bowdoin*, 17 *Wendell* 14. 20 *Wendell* 267. *Bard* v. *Stewart*, 3 *Monroe's Rep.* 72. *Tyler* v. *Ulmer*, 12 *Mass. Rep.* 163. *Magne* v. *Seymour*, 5 *Wendell* 309.

IV. By the removal of the property from the mill-yard the plaintiffs lost their *lien*. 2 *Hill & Cowen's notes* 230. *Whiteacre's Law of Lien*, pp. 2, 7, 26, 36, *and* 68. 12 *Petersdorff* 179. *Coleman* v. *Shelton*, 2 *McCords Ch. R.* 128. *Hollister* v. *Nowlen*, 19 *Wendell* 234. *Cole* v. *Goodwin*, *Id.* 251. *Clark* v. *Faxton*, 21 *Id.* 153. *Camden* &c, *Rail-Road* v. *Belknap*, *Id.* 354.

*Points presented and argued on the part of the defendants in error:*

I. The court below committed no error in the admission of evidence on the trial.

1. The declarations of the defendant himself were legal evidence against him.

2. A general deputy of the sheriff is his general agent, authorized to do every official act that the sheriff himself could do; the sheriff is therefore liable *civiliter* for all the acts of his deputy, which are done ostensibly as deputy.

3. It is not necessary to prove that a general deputy had process in his hands, to charge the sheriff for his acts. If the deputy did the act complained of ostensibly *as deputy*, that is sufficient *prima facie* to charge the sheriff. The office, powers and duties of a general deputy, and the under-sheriff, in this state, are the same during the life of the sheriff. They are officers known to the law as having full

power and authority to act for the sheriff *in all cases.*  1
*R. L.* (1813,) *p.* 420, 421, § 5.   *Tillotson* v. *Cheetham,*
2 *Johns. R.* 69 *to* 74.   *Hunt* v. *Burrel et al.,* 5 *Id.* 137–8.
*Jackson* v. *Bush,* 10 *Id.* 223.   *Jackson* v. *Davis,* 18 *Id.*
10–11.   It necessarily follows, that the declarations of a
*general* deputy of the sheriff, or any other *general* agent,
at the time he is doing a particular act within the scope of
his authority, and which he would have no authority to do
but as such agent, that he was doing such act as deputy or
agent, is competent evidence against his principal.   The
cases in relation to the proof necessary to charge a sheriff
for the act of his bailiff, have no application to this princi-
ple.   A bailiff is a special, and not a general agent; it is
necessary, therefore, in such cases, to prove the authority
from the sheriff authorizing the bailiff to do the act com-
plained of.   But in those cases it is not necessary to give
any proof of the *process* issued to the sheriff:  It is the
*warrant* from the sheriff to the bailiff that is required to be
proved, as the bailiff has no authority to act for the she-
riff, unless specially authorized in each case, and as that
authority is contained in the warrant from the sheriff to the
bailiff, which directs him to do the particular act, the
warrant must be proved, as that is the best evidence of the
fact.   *Grey* v. *Smith et al.,* 1 *Camp.* 387.   *Drake* v.
*Sykes,* 7 *T. R.* 109.   *For forms of warrant from sheriff to
his bailiff, see Impey's sheriff,* 538.   The declarations of a
general deputy in relation to process in his possession, *un-
accompanied by any act,* are evidence against the sheriff.
*Mott* v. *Kip,* 10 *Johns. R.* 478.   *Yabsley* v. *Doble,* 1 *Ld.
Raym.* 190.   So, what a bailiff says in relation to his abili-
ty to make an arrest, (after proof that he is such bailiff,)
is evidence against the sheriff.   *North* v. *Miles et al.,* 1
*Camp.* 389.

II. Eldridge, the deputy, for whose act this suit was
brought against the sheriff, (plaintiff in error,) was clearly
interested, and was therefore properly excluded as a wit-
ness.

1841.

McFarland
*v.*
Wheeler.

**1841.**

McFarland
*v.*
Wheeler.

III. There was sufficient evidence of the taking of the property by the deputy Eldridge, to sustain this action; the charge of the court was, therefore, in that respect correct. *Pangburn* v. *Patridge*, 7 *Johns. R.* 140. *Dunham* v. *Wyckoff*, 3 *Wendell* 280. *Chapman* v. *Andrews, Id.* 242. *Lewis* v. *Palmer,* 6 *Id.* 368. *Phillips* v. *Hall,* 8 *Id.* 613.

IV. The defendants in error had a valid lien upon the property taken by the deputy Eldridge, which entitled them to the absolute possession until that lien was discharged.   There was, therefore, no misdirection of the court in that respect, either in charging the jury as they did, or in refusing to charge as requested by the counsel for the defendant (below.)   *Kirkman et al.* v. *Shawcross,* 6 *T. R.* 14.   In *Green* v. *Farmer,* 4 *Burr* 2221, Lord Mansfield says the convenience of commerce and *natural justice* are on the side of liens, and courts therefore lean to their support.

By *Senator* VERPLANCK.   In this case the right of action depends wholly upon the continuance of the *lien* on the replevied boards for the price of sawing them, and if that right had ceased at the time of the levy there is an end of all the other questions which have been raised in this unusually protracted litigation.   I think that the supreme court erred in holding that the special agreement continuing the lien upon the boards after their delivery to the owner gave the plaintiffs below such a special property in them as to authorize an action to be brought by them against the sheriff.

*Lien* has been well defined to be " the right of one man to retain property in his possession belonging to another, until certain demands of the party in possession are satisfied." *Hammond* v. *Barclay,* 2 *East.* 235.   This definition, given by Judge Grose, has been adopted in our American decisions and text-books of commercial law. Thus the sole question presented for decision in cases of

lien, either in law or equity, is, as *Sir W. Grant* expresses it, " whether there be a right to *detain* the goods until a certain demand be satisfied." *Gladstone* v. *Burlay*, 2 *Mer. R.* 404. The particular lien given to mechanics, millers, artificers, dyers, carriers, &c. is an application of a common law principle dictated by natural justice, which gives to every man who has a lawful possession of any thing upon which he has expended his money, labor or skill, at the request of its owner, the right to detain it as security for his debt, instead of leaving him to the risk of losing his labor, time or money by trusting only to the general responsibility of the customer. This common law right may be extended by an express contract, or one implied from usage and mutual understanding, that the moveables in possession of one party shall not only be held for the expenses and labor actually bestowed upon them, but also as a security for the balance of similar demands. Such a contract is in the nature of a pawn of the articles, and like all other pledges, depends upon continued possession; for it is simply a bargain that the pledge shall be retained until the debt is paid.

The very definition of the word, *lien*, as " the right to retain," indicates that it must cease when the possession is relinquished. This principle, so clearly founded in reason and so congruous to public utility and the convenience of trade, is supported by the uniform testimony of the decisions. Thus said Lord Kenyon, " the right of *lien* has never been carried farther than while the goods remained in possession of the parties claiming them." 1 *East.* 14. This remark was cited with approbation by Lord Ellenborough in *McCombie* v. *Davies*, 7 *East.* 7, and the whole current of decisions in equity and common law in England and in the United States, is the same way.

Now, in this case, there was a voluntary relinquishment of possession by allowing the owner to take the sawed boards from the mill-yard to a landing place on the canal, procured by himself, and which, in the charge, is called his

1841.

McFarland
*v.*
Wheeler.

1841.

McFarland
v.
Wheeler.

"landing ground:" The boards appear to have been so much under his control there, that he not only removed one boat load with the plaintiffs' consent, but two more without their knowledge. It was, indeed, expressly stipulated that the lien of Wheeler & Co. for sawing, "should remain the same as if the lumber were piled up in the mill-yard." This stipulation was considered by the late Chief Justice as equivalent to a continuance of possession. "Their rights were the same," he says, "as if they paid the rent of the ground on which the boards were piled, or as if they were piled up in their mill-yard." I cannot give such an effect to this agreement as against any third party. Special stipulation may enlarge the lien so as to secure other legal demands besides those to which the law itself gives that privilege; but it is in contradiction to the principle and policy of the law to allow any such agreement to extend the right itself beyond possession. It would be recognizing a right to retain after the property had ceased to be retained. I know of no decision that has held such an extension valid; if there be one, its authority must be high indeed to enable it to sanction such an encroachment upon the doctrine and usage of the law. It is true, that the possession thus essential to the lien need not always be the direct and actual possession of the party; that of his agent, servant or the keeper of a warehouse acting under his authority is also his own, for this as for many other legal purposes. If, then, the boards had been placed under the control or upon the lands of some third person for the convenience of both parties, but under the authority of the owners of the saw-mill claiming the lien, or if the place of deposit had been some public wharf where the lumber was placed under the control of those claimants and in their name, there might be a continuance of legal possession. But here the real possession is that of the owner of the boards, which is inconsistent with their being retained for any charge upon them. So plainly is any such possession by the owner inconsistent with the

continuance of the right of a lien or to a pledge, whether by law or contract, that it has been held that even the right and exercise of occasional control and possession by the owner must terminate any lien. Thus, Chief Justice Best held in the case of a livery stable-keeper, that " there is no lien, because the horse is subject to the control of its owner, and may be taken out by him; and the first time it goes away, *there is of course an end to the lien.*" *Bevan* v. *Waters*, 3 *Carr & P.* 520. How much stronger is the present case, where the whole apparent and continued possession and the real control is with the indebted owner ?

It has been suggested, that the lien thus extended beyond possession by express agreement, would operate as a mortgage. Not so. It would only constitute it a pledge without possession. The legal distinction between a pledge and a mortgage is often overlooked. It is no where more precisely defined than in a *percuriam* opinion of our own court, delivered by Chief Justice Kent: " The note came under the strict definition of a pledge. It was delivered with a right to retain as security for debt. But the legal property does not pass as it does in case of a mortgage with condition of defeasance. It is, therefore, to be distinguished from a mortgage of goods, for that is a pledge to become an absolute interest if not redeemed at a fixed time. Delivery is essential to a pledge, but a mortgage of goods is in certain cases valid without delivery." *Cotelyou* v. *Lansing*, 2 *Caines' Cas. in Er.* 202. We have here no condition of the property becoming absolute if this demand for sawing is not paid at a given time. There was simply an agreement that security of the lien should continue: or in other words, that the boards should be considered as a specific security after the possession was parted with. The contract is valid between the parties, and might, I presume, be enforced in equity, or perhaps at law under certain circumstances. But it is a contract the parties have no right to make, so as to control the rights

1841.

McFarland
*v.*
Wheeler.

of other persons, and it would be in hostility to all the definitions, reasonings and decisions on this head to regard the lien as still valid against creditors or purchasers in good faith.

Every reason of policy that has ever induced courts to watch with suspicion sales and mortgages unaccompanied by possession, and to presume them fraudulent when secret and known only to the parties, applies with yet greater force to a secret continuance of lien after the owner receives voluntary possession. It opens a wide door to fraud and abuse. If this action can be maintained against a sheriff, who levied upon the boards, others may also be maintained against those persons who have bought the boards mentioned in evidence as having been taken off by the owner without the consent of the agent of the sawmill. Thus, the indulgence given to the owner and the private arrangement between him and those who claim the lien, would work gross hardship to fair purchasers acting upon the apparent indication of a perfect right of property held out by this stipulation. In looking through the reported cases referred to in argument, I was much struck with the wisdom of a remark of Lord Ellenborough, made after a long professional and judicial experience: "In a case of *lien*, we should be anxious to tread cautiously, and on sure grounds, before we extend it beyond the limits of decided cases." 1 *Maule & Sel.* 168. Accordingly I have no hesitation to vote for a reversal of the judgment of the supreme court on this ground alone, without further examination of most of the other points raised in the argument.

There was, however, one exception taken to the charge of the court below, touching a question that must enter so often into the daily business of life, that I cannot pass it over in silence. It is that respecting the extent and amount of the lien, supposing it to have continued in force after the removal of the boards. The court charged the jury as to the law by which they were to be governed,

that " the boards left at the landing place were subject to the lien for the price of sawing all the boards and lath, including those which had been removed by the owner with the plaintiffs' consent." The court did not leave it to the jury to decide whether there was any special agreement to that effect, but states this as the inference of the law; and besides, it is expressly in evidence, that " there was no agreement that the lien for sawing the lumber taken away should be transferred to the boards which remained." Thus, supposing the supreme court to be correct as to the continuance of possession constructively, the question is presented whether the boards thus remaining in the possession of those entitled to a lien, were subject to be detained as security for the price of sawing the whole. This does not depend upon the distinction between general and particular liens, which latter species alone applies to cases like the present. That well settled and familiar distinction is no where more clearly stated than by Judge Heath, in *Houghton* v. *Matthews*, 3 *Bos. & Pul.* 491. " The particular lien is when a person claims a right to retain goods in respect of labor or money expended on them. Such liens are favored in law. General liens are claimed in respect to a general balance of accounts, are founded in contract, and are to be taken strictly." The lien of the mechanic, miller, dyer, &c. is always particular. It is very clear, that in such a case as the present, the manufactured material would not be subject to any lien for any prior transaction. But the doubt is whether, every such contract and delivery of raw material is to be considered as one whole, each part whereof is bound for the price of the whole : as here, whether the lien is for the $2.25 the hundred, upon the eight thousand boards left, or for the $330, due for sawing the whole fourteen thousand pieces.

I have found, with some surprise, that the law on this subject is not distinctly and unequivocally laid down in the books, nor by any direct adjudication with us, except

the single one of *Schmidt* v. *Blood*, 9 *Wendell* 268, in our supreme court, in respect to the lien for storage; and as this case has not been supported or recognized by any subsequent decision, or applied to any other species of lien, the principle may be still subject to re-examination. Several of the modern elementary books and digests which I have looked into in our state library, take no further notice of this point, than to say, with *Paley* and *Chitty*, that " a particular lien is the right to retain a thing for some charge growing out of that identical thing." The common understanding and usage, I take to be different from those to which a literal interpretation of this definition would lead. The first case in which this distinction is noticed, is the comparatively modern one of *Close* v. *Waterhouse*, reported in a note to 6 *East*. 525. Tender had been made of the price of dyeing certain goods, which the defendant claimed to retain for his general balance for such work, on the ground of local usage. The jury negatived any such usage, and on motion for a new trial, the court of king's bench held, that as no usage was proved, the defendant could not retain for the price of dyeing, any other than the particular goods dyed, " or at most only for the dyeing of such goods as were delivered at one time, and under one and the same contract." Here, at this comparatively recent date, is a hesitating expression of doubtful opinion, which the judgment of the case does not necessarily support. Again, in a case stated, *arguendo*, in 6 *East*. 622, Chief Justice Kenyon ruled at *Nisi Prius* that the master and owner of a ship in which a quantity of tar was imported, had after delivering half of it, a lien upon the remainder for the freight of the whole, it having been all received from one owner at one time, and under one contract. Yet he doubted whether this would not be otherwise, if the tar had been sold to different persons. This state of uncertainty as to the law upon a matter that must have been of daily occurrence, continued until 1814, when the court of king's bench decided, in *Blake* v. *Ni-*

cholson, 3 *Maule & Sel.* 168, that a printer employed to print certain though not consecutive numbers of a work, had a lien upon the copies not delivered for his balance due for printing the whole.   Lord Ellenborough thought "that the printer had a lien for the whole balance, the work being an entire work, in the course of prosecution, upon the same principle that a tailor employed to make a suit of clothes, has a lien for the whole price upon any part of them.   The nature of the work affords a reason for his general lien."   Finally, our supreme court, in *Schmidt* v. *Blood,* decided that where a warehouseman delivers, from time to time, portions of the goods stored in his warehouse, without payment for the storage, he has a lien upon the portion left for the storage of the whole. This case however, as far as I can trace it, stands alone in our courts; and if the question be still considered as open, (as the exceptions and points taken in this case indicate it to be,) either on account of the supposed reason of the right itself, or from the doubtful language of older cases and modern books, it is very desirable to establish some certain rule on a subject of such frequent occurrence.

Should my conclusion on the first branch of the case not be sustained by a reversal of the judgment upon that ground, it may be necessary for the decision of the case, to express our opinion upon this point, upon which I have conferred with some of the members of the court, of much practical experience.   Our opinion is decidedly with that expressed in the charge as being most in accordance with decided cases, with general convenience, and we think, with the equity and understanding of the contract.   When part of a cargo on freight, or of a quantity of manufactured articles, under the same contract, and subject to lien, is delivered up to the owner, there is no reason why the creditor should suffer for this.   As long as the rest is retained for the securing the whole demand, we do not see how any third person can be injured or exposed to impo-

sition; whilst as between the parties, it is fair and just, and frequently of mutual convenience. Besides, the principle is, that when the labor or expense of one man is laid out on the materials of another, he has a right to be paid for his share of the increased value before he delivers up the goods. When he delivers part and retains the rest, there is a fair presumption of an agreement or mutual understanding that the property retained shall be kept as security for the whole debt incurred on that contract, unless there be some circumstances incompatible with such an understanding. If there be such a doubt of the employer's responsibility as to induce the mechanic or carrier to retain any part of the articles subject to his lien, it can scarcely be supposed that he meant to do more than to lessen the amount of his own security for his customer's convenience; not that he meant to lessen the amount secured upon less security, though in his judgment still adequate. Yet farther: particular liens have always been held to be in conformity with natural equity and general convenience, and as such, to be favored in law. If, then, this point is not clear on other accounts, it is both wise and equitable, and in unison with the spirit and analogy of the law to adopt the broadest rule of the decisions; so that when goods or other articles subject to a particular lien are delivered in part, those retained may be held to secure the payment for all the labor, skill or expense laid out upon the whole, under one and the same contract, between the same parties: thus constituting one debt. The judgment of the court is therefore not erroneous in this respect; but it should be reversed for the reasons I have before assigned; because the stipulation of the owner of the boards, that the lien on them should continue after their removal by him, could not make his possession that of the plaintiffs' below, so as to affect third persons; and that the court below erred at the trial in holding " as to the law by which the case was to be governed, that the plaintiffs' lien continued, having followed the boards to E. Vaughan's landing ground

on the canal bank, which he had procured for that pur-
pose, in pursuance of the agreement between him and the
said plaintiffs."

*Senator* PAIGE was of opinion, that the plaintiffs did not
lose their lien by the removal of the boards to the bank of
the canal, it being expressly agreed by the parties that the
lien should continue notwithstanding such removal. The
owner of the boards was to procure the ground for their
piling, and after they were thus piled, the boards were as
much in the possession of the plaintiffs as when in their
mill-yard. He was also of opinion that a sufficient *taking*
by the deputy was shown to support the action.

*Senator* NICHOLAS said, that the *lien* of a person who
had bestowed labor and expense in the manufacture of an
article should be protected if possible; but if he permits
the property to be removed from his premises, and yields
the possession of it, he loses his lien. To sustain it under
circumstances like those existing here, would lead to gross
frauds.

*Senator* LEE. There is no lien without possession of
the property.

*Senator* ROOT. The removal of the boards destroyed the
common law lien; the agreement between the parties
might be good, and as between themselves might be en-
forced, but not so as to third persons. Whilst the boards
remained in the possession of the plaintiffs, the sheriff or a
purchaser would naturally inquire for a lien; but there was
nothing to induce such inquiry after the property was re-
moved from the mill, and in possession of the owner.

The CHANCELLOR said, that he agreed there must be pos-
session in the party claiming the lien, but the question
here was in whom was the possession after the removal of
the boards to the bank of the canal. The owner of the

boards had agreed to hire ground for their piling, and that the lien should continue the same as if they were piled in the mill-yard. Under these circumstances, the plaintiffs, in his judgment, must be deemed in possession. Had the boards been stolen, it would have been necessary in an indictment to have alleged that the plaintiffs were owners.

*Senator* DICKINSON said, that he considered the lien lost. If the plaintiffs could give permission to remove the boards half a mile and retain their lien, they would be equally entitled to retain it, if they permitted them to be removed one hundred miles.

By the PRESIDENT of the Senate. The main questions in this case are: 1. Whether, under the special agreement between the defendants in error, and Edmund Vaughan, the original owner of the lumber in question, the constructive possession of the lumber so continued in the former, notwithstanding they had parted with its actual possession, as to continue their original *lien* for the sawing ? 2. If so, whether the defendants in error, who were the plaintiffs in the original suit, were entitled to the action of *replevin* in this case ? and 3. If so, did their right of action accrue on the *levy* being made under the execution issued on the judgment of David Vaughan, and before any sale or removal of the lumber had taken place ?

As a general principle, *possession* is indispensable to *lien*. When, therefore, the former is parted with, the latter is lost. Such possession and lien, however, may undoubtedly be continued by special agreement, so far as the immediate parties to the agreement are concerned, even after the actual possession has been parted with; but not to the prejudice of general creditors or *bona fide* purchasers for valuable consideration and without notice. They cannot be bound nor their rights concluded by any such agreement between the original parties. The establishment of a contrary doctrine would be in the highest degree dangerous, especially in a country so commercial as ours,

where property changes owners so frequently, and that not by sale and purchase in *market overt*. To allow these secret liens to go along with property into the general market, unaccompanied by possession, and without any visible marks to indicate their existence, would be to expose to hazard every *bona fide* purchaser of property, and would be a fraud upon honest creditors. Such a doctrine, too, would be a violation of that sound general policy, which should afford every inducement and security to the alienation of property, and every facility to its easy and safe transfer from hand to hand. In the present case it is in proof that, by a special agreement between the original parties, Vaughan was permitted to take the lumber out of the actual possession of the defendants in error, and to remove it a considerable distance to a place on the canal bank, to be procured by him and at his own expense. He there exercised every act of ownership over it; sold and removed three boat loads of it, until the remaining lumber was not sufficient to pay the balance of the account for sawing the whole. Under these circumstances, to protect this lien to the prejudice of creditors and purchasers, would, in my judgment, be carrying the doctrine of lien to a most dangerous and undue extent. Let us suppose that the judgment creditor, in this case, had been a *bona fide* purchaser of the property in question for valuable consideration, and without notice of this constructive possession and secret lien, thus attempted to be continued by the special agreement between the original parties, could his title to the property have been impugned on such grounds, or the preference of this conventional lien have been enforced against it? Certainly not. And if not, can an effect be given to this special agreement against an honest creditor, which is denied to it as against a purchaser in good faith? This, I think, will not be pretended.

If the views thus presented on this point be correct, they are conclusive of the whole case. But if the court should come to a different conclusion on this first point,

then it may be material to notice for a moment the other two.

It is undoubtedly true, that a party having a legal subsisting lien upon property, accompanied by possession, may have his action of *replevin* whenever he is so disturbed in that possession as to threaten the defeat of his lien. The action of replevin lies in all cases where *trespass de bonis asportatis* will lie. Such is the established doctrine of the cases. This right of action accrues whenever the possession is disturbed. This, as in the present case, may be by a mere levy, without a sale or removal of the property, for, by a formal levy, the property is deemed to pass into the possession of the officer. It is virtually in the custody of the law. The possession of the original lien holder has been disturbed, and his right of replevin has, of course, already accrued. And so are the authorities. If, therefore, the defendants in error, at the time of the levy upon the property in question, had a valid, subsisting lien thereon, accompanied by legal possession, they were entitled to their action of replevin; and their right of action accrued at the moment of the levy, without waiting either for a sale or removal of the property.

But believing that the defendants in error, at the time of the levy, had no such lien or possession, as against the judgment creditor; and considering the views above presented on the first point as conclusive, I am of opinion, that the judgment below is erroneous, and that, therefore, the judgment of the Washington county common pleas, and the judgment of the supreme court, affirming the same, should be reversed, with the costs to abide the event of the suit; and that a *venire de novo* should be awarded.

On the question being put, *Shall this judgment be reversed?* all the members of the court present at the argument of the cause, except the CHANCELLOR and *Senator* PAIGE, voted in the *affirmative;* the Chancellor and Senator Paige voted in the *negative.* Whereupon the judgment of the supreme court was REVERSED.