CHARLES E. PEARCE, Respondent v. WABASH RAIL-
ROAD COMPANY, Appellant.

### St. Louis Court of Appeals, May 7, 1901.

1. **Common Carrier:** CONNECTING CARRIER: LIENS ON GOODS IN TRANSIT: POSSESSION. A carrier may pay, to a connecting carrier, charges the latter has paid, and retain possession of the goods for its reimbursement, when the advance charges were such as were incident to the transportation of the goods and were necessary to be paid in order to continue them in transit, such as freight and warehouse charges and for the discharge of matured and valid liens on the goods, created by law or by the owner for the non-payment of which the transit of the goods has been stopped, or their possession withheld from the carrier.

2. ———: ———: PAYMENT OF LIEN: CONSENT OF OWNER TO PAYMENT OF LIEN AGAINST GOODS IN TRANSIT. But the payment of the lien, in order to continue the transportation, is not obligatory on the carrier and if made without the consent of the owner, is at its risk.

3. ———: ———: ———. In the case at bar, it is admitted in the agreed statement of facts and shown by the testimony, that the goods were shipped in bond from Yokohama, and that the boxes containing

the goods were carefully packed, strapped and sealed and marked "shipped in bond," and that a customs clearance, signed and sworn to, was indorsed or signed by John McLean, consul general at Yokohama, showing the entrance of the goods was to be made at St. Louis. *Held,* that the goods were entitled to direct importation to the port of St. Louis, and that as all the railroads that carried said goods were bonded roads, there was no occasion for their diversion to the port of St. Paul.

4. ———: ———: ———. And that the payment of customs duties at St. Paul was not necessary nor an incident to the transportation of the goods to the place of destination.

5. ———: ———: ———. And that whatever rights, if any, appellant may have to recover the amount it has paid for respondent's use and benefit, it has no lien on the goods for reimbursement.

Appeal from St. Louis City Circuit Court.—*Hon. Franklin Ferris,* Judge.

Affirmed.

*Geo. S. Grover* for appellant.

(1)   The Government of the United States had, until the payment was made to it, a prior and paramount lien on the goods for the duty which Major Pearce has refused to pay.   Overton on Liens, sec. 656, p. 709, and cases cited; Hodges v. Harris, 6 Pickering (Mass.) 360, sec. 3095, et seq.; R. S. of U. S. 1878, pp. 594, et seq.   (2)   The defendant has, also, a valid lien on the goods in question for the charges advanced by it to its connecting line, in the usual course of business.   Ray on Freight Carriers, sec. 102, p. 407, and cases cited; Hutchinson on Carriers (2 Ed.), sec. 478a, p. 541, and cases cited; Schouler on Bailments, p. 544, and cases cited; Wells v. Thomas, 27 Mo. 17.   (3)   The case here relied on by the plaintiff (Mellier v. Railroad, 14 Mo. App. 281) is not in point, because there was no agreement here to

transport the goods in question in bond; nor were they, as in Mellier's case, supra, lost in transit by reason of an attempted misdelivery to an irresponsible connecting carrier, who refused to receive them.

*Charles E. Pearce, pro se, E. C. Kehr* of counsel.

(1) St. Louis, Missouri, being a port of entry and delivery, the plaintiff was entitled under the laws of the United States, to have the said goods shipped and brought to St. Louis "in bond" and at St. Louis to make his "entry" for the purposes of customs payment; and said goods having been duly cleared by the United States consul-general at Yokohama for entry at St. Louis, and having been shipped "in bond" from Yokohama, and having been delivered to and received by the Canadian Pacific Railway Company for transportation "in bond" to St. Louis, it became the duty of the said Canadian Pacific Railway Company to transport said goods "in bond" to St. Louis, and if so transported, said goods were not subject to examination and customs assessment at any point other than St. Louis in the absence of alleged fraud. U. S. R. S. suppl. vol. 1, (2 Ed.), sec. 7, p. 294; U. S. R. S., 1878, (2 Ed.), sec. 3102. (2) In the performance of its contract obligation there was no obligation on the part of the Canadian Pacific Railway Company, or any of its connecting lines, under the laws of the United States, to pay duties on said goods at St. Paul or at any other place. Sheldon on Sub., p. 4, sec. 3. (3) The act of the Canadian Pacific Railway Company in changing the bonded consignment and destination of the goods being tortious, no equitable right could arise out of such action even if it was true that this defendant was innocent in its doings. Mellier v. Trans. Co., supra. (4) A common carrier, who innocently receives goods from a wrong-

doer and without the consent of the owner, expressed or im-
plied, has no lien on them for even his carriage charge as
against the said owner, much less so when there is actual know-
ledge of the wrongdoing. Redfield on Railways, sec. 188.
(5) The lien of the United States for its duties is not assign-
able, nor is it the subject of subrogation, except in favor of
one who, by the express act of the shipper or consignee, is con-
stituted a forwarding agent, and except, further, the discharge
of said lien is necessary to the completion of the original un-
dertaking. The Canadian Pacific Railway Company and
this defendant, as its agent, were simply carriers in respect to
these goods, and were strictly bound by the terms of the original
shipment, which provided for the transportation "in bond"
to, and the payment of customs duties at, St. Louis, not St.
Paul. Hutchinson on Car. (2 Ed.), sec. 493; Mellier v.
Trans. Co., supra.

BLAND, P. J.—Briefly stated, the facts are, respondent
shipped in bond via the Canadian Pacific Railway Company
and its connecting steamship line, four boxes of curios from
Yokohama, Japan, consigned to Wilfred Schade & Co., desti-
nation port of St. Louis, Missouri, and prepaid the freight
charges for the entire route. From Yokohama the goods were
carried by steamship to Vancouver, British Columbia, and
there delivered to the Canadian Pacific Railway Company
and were by it placed in a bonded car, duly sealed. For its
own convenience, without the knowledge or consent of the plain-
tiff or the consignee, the Canadian Pacific Railway Company
changed the bonded destination of the goods to the port of St.
Paul, Minnesota, and it and its connecting line, the Minnea-
polis, St. Paul & Sault St. Marie Railway Company carried
the goods to St. Paul and delivered them to the United States
customhouse at that point. The United State customs offi-

cials at the port of St. Paul received the goods, opened the packages, examined them and appraised their contents and assessed the import duties and charges on the goods at $264.31. The Minneapolis, St. Paul & Sault St. Marie Railway Company paid the customs dues so assessed, took the goods from the customhouse as repacked by the customhouse officials and billed them to the Chicago, Milwaukee & St. Paul Railway Company to be by it forwarded to Given, Iowa, where the latter company connects with the appellant railway company. The $264.31 import dues were incorporated in the waybill furnished the Chicago, Milwaukee & St. Paul Railway Company by the Minneapolis, etc., Railway Company as advance charges. These charges, the Chicago, etc., Railway Company paid to the Minneapolis, etc., Railway Company. The Chicago, etc., Railway Company carried the goods to Given, Iowa, and there delivered them to the appellant railway company to be carried to their destination, St. Louis, Missouri, and furnished it a waybill showing the payment by the Chicago, etc., Railway Company of the $264.31 as advance charges, which the appellant agreed to pay and afterwards did pay.

The appellant carried the goods to St. Louis in the same condition they were in when it received them, and offered to deliver them to the respondent on the payment by him of the advance charges of $264.31. Respondent discovered that the packages had been opened after their shipment from Yokohama, and refused to pay the charges unless he was given opportunity to open the packages and inspect the goods to ascertain their condition. The appellant refused to permit the inspection in advance of the payment of charges, and respondent replevied the goods and took them into his possession. On opening the packages he discovered that goods of the value of $350 had been abstracted and that others had been damaged. Item thirteen of the agreed statement of facts is as follows:

"That when said Wabash Railway Company, defendant herein, received said goods from the Chicago, Milwaukee & St. Paul Railway Company, as hereinbefore stated, said Wabash Railway Company, defendant herein, became responsible under its traffic arrangements for the payment of said sum of $264.31 to the said Chicago, Milwaukee & St. Paul Railway Company, and did not at the time know that said charges were other than the usual and ordinary freight charges upon said goods advanced by each carrier of the same from the point of shipment to the place of delivery." And the first clause of the fourteenth item reads as follows: "That the Wabash Railway Company, defendant herein, transported said goods in the month of June, 1895, in due time and in good order from said Given, in the State of Iowa, over its line of railway to the city of St. Louis." The evidence tends to prove that the loss of some of the goods and the damage to others were occasioned through the fault or negligence of the customhouse officials at St. Paul, and there is no evidence whatever that any of such damage is attributable to the wrong or negligence of the appellant; on the contrary, it is admitted that the goods arrived at St. Louis in the same condition in which they were when received by the defendant at Given, Iowa. The original contract of shipment expressly provides that each carrier in the line, beginning at Vancouver and ending at St. Louis, "shall be liable only for whatever negligent act was committed by it upon its own line and no other." In this state of the case the defendant is not liable for the loss or for damages to the goods (Nines v. Railroad Co., 107 Mo. 475) and respondent can not offset his damages against the advanced charges paid by appellant.

Respondent bases his right to the goods on the assumption that the entry of the goods at the customhouse at St. Paul was not only unnecessary, but was in violation of the contract of

shipment and prejudicial to him; that the payment of the customs dues at St. Paul was not necessary or incidental to their transportation. A carrier may pay to a connecting carrier charges that the latter has paid and retain possession of the goods for its reimbursement, where the advance charges were such as were incident to the transportation of the goods and were necessary to be paid in order to continue them in transit; such as freight and warehouse charges and for the discharge of matured and valid liens on the goods, created by law or by the owner for the non-payment of which the transit of the goods has been stopped or their possession withheld from the carrier. Steamboat Virginia v. Craft, 25 Mo. 76; Richardson v. Risk, 104 Mass. 156; Redfield on Carriers, 282; Hutchinson on Carriers. But the payment of the lien in order to continue the transportation is not obligatory on the carrier and, if made without the consent of the owner, is at its risk. The United States has a specific statutory lien upon the importation for the payment of import duties, and one which had to be discharged before the goods could be lawfully delivered to the respondent or to the consignee. The value of this lien could only be ascertained by inspection and appraisement by the authorized officials of some customhouse at a port of entry. U. S. R. S. 1878, (2 Ed.), section 3097, requires a carrier having imported goods in charge, arriving on the north or northwestern frontier, to report them to the collector in charge of the port of entry in the district in which the goods shall first arrive, accompanied with manifest and entries, and it is made the duty of the collector of such ports to exercise and discharge the same duties as if the importation had been made by sea, but this section has no application to imports brought into the United States in bond. It is admitted, in the agreed statement of facts, and shown by the testimony, that the goods were shipped in bond from Yokohama, and the evidence is that the four

boxes were carefully packed, strapped and sealed, and marked "shipped in bond," and that a customs clearance in quadruplicate, signed and sworn to, was indorsed or signed by John McLean, consul general at Kanagawa (which is Yokohama), showing the entrance of the goods was to be made at the port of St. Louis. Under this state of facts it was clear that the goods were entitled to direct importation to the port of St. Louis, as provided by U. S. R. S. 1878, (2 Ed.), sec. 3102, and, as all the railroads that carried the goods were bonded roads there was no occasion for their diversion to the port of St. Paul.

The Canadian Pacific Railway Company had in its possession one of the quadruplicate clearance certificates and was by it and by the marks and brands on the boxes apprised of the fact that the goods were shipped in bond and entitled to continuous and unbroken carriage to the port of St. Louis, but for its own convenience, as stated in the agreed statement of facts, changed the bonded destination of the goods to the port of St. Paul. After this diversion and the assessment of the customs due on the importation by the collector of customs at St. Paul, it was indispensable, to regain possession of the goods so as to continue their transit, that the import duties should be paid at St. Paul. And the contention of appellant is that as their payment was in discharge of a lien the United States had on the goods, which in any event had to be discharged before the respondent could gain possession of them, that he was not prejudiced by the payment made at St. Paul and that as appellant could only have the goods for carriage by agreeing to pay the amount of customs dues, that a lien for such advancement should be declared in its favor. In view of the fact that the appellant agreed to pay the amount under the impression that it represented advance charges for the carriage of the goods by its predecessors and had no knowledge or information that it

represented customs dues, it seems somewhat of a hardship to deny the relief prayed for. But legal and equitable principles and rules can not be stretched beyond proper bounds to relieve a litigant of every hardship in which a court of law or equity may find him. The lien of the United States for import duties was not to be discharged at St. Paul but at St. Louis. The amount of the lien was not to be ascertained at St. Paul but at St. Louis, and they were not to become due or payable until the goods were carried to their final destination and delivered at the port of St. Louis for appraisement and assessment of import duties. Their payment at St. Paul was not necessary nor an incident to the transportation of the goods to the place of destination; on the contrary, the diversion of the goods to the port of St. Paul, which made the payment of the assessed dues necessary to continue the goods in transit, was in violation of the United States custom laws as well as of the contract of shipments made with the Canadian Pacific Railway Company. The appellant, as a succeeding carrier, to establish a right of lien must derive that right through the wrongful diversion of the bonded destination of the goods by the Canadian Pacific Railway Company; though innocent of this wrong, it is as much affected by it in respect to the right of the lien on the goods as if *it* had prepetrated the wrongful diversion. Its rights in this regard are derivative and can rise no higher than their original source—the Canadian Pacific Railway Company. An equity can not be founded upon a wrong, nor derived from a violation of both law and contract. Whatever rights, if any, appellant may have to recover the amount it has paid for respondent's use and benefit, we think it is clear, both upon reason and authority, that it has no lien on the goods replevied for reimbursement, and affirm the judgment. Judge *Goode* concurs in a separate opinion; Judge *Bond* dissents and also files separate opinion.

SEPARATE CONCURRING OPINION.

GOODE, J.—I agree with Judge BLAND. Plaintiff made a contract for the shipment of the goods in question in bond and under the seal of the American consul at Yokohama, for the purpose of preventing an inspection of them by customs officers until they arrived at St. Louis, the port of destination. The United States' statutes gave him the right to ship them in that way. Both his statutory and contract rights were ignored by diverting them at St. Paul. The diversion was for the convenience of the Canadian Pacific Railway Company, merely, and is Pearce to be compelled to pay anyhow? The duties were not properly collectible at that port, because the Federal officials had no right to ignore the Federal statutes which made them collectible in St. Louis, whither the manifest showed they were consigned "in bond," unless they were voluntarily turned into another customhouse. Guesnard v. Railway Co., 76 Ala. 452. This put all the equities on the side of the respondent, so that no lien could equitably arise in favor of the company which paid the import duties at St. Paul, or in favor of a subsequent one which agreed to reimburse that one. If the theory of the rule allowing a lien is that the carrier acts as the owner's agent in paying the charge, as is said in Overton on Liens, section 140, how could any company have paid at St. Paul, as the agent of Pearce, against the latter's direction and wish? If the contract of shipment had been complied with, the damage to the goods would have been avoided. A carrier paying such demands assumes the risk of their validity. It is true the owner would have had to pay the imports at St. Louis, but then he would have obtained the benefit of his contract for a through shipment without unpacking.

But I know of no law which gives a carrier the right to

pay import duties and retain a lien on the goods for reimbursement. Such liens are usually confined to claims or demands connected with the cost of transportation. Steamboat Virginia v. Kraft, 25 Mo. 76; Rushforth v. Hadfield, 6 East 519; Faith v. East India Co., 4 B. & Ald. 630; Hutchinson on Carriers (2 Ed.), sec. 478. The lien for carriage is jealously regarded and restricted. Hutchinson on Carriers (2 Ed.), sec. 477; McFarland v. Wheeler, 26 Wend. 467; Railway Co. v. Hunt, 15 Lea. 261; Overton on Liens, sec. 134. I concede that the reason of the rule, allowing railway companies a lien for back charges for transportation, might well extend it to embrace a claim of this kind, on proof that there is a general custom for carriers to pay import duties, charge the same against the owner of the property and collect them before delivery. This would depend on a usage of trade for, unquestionably, it is opposed to the common law and there is no statute. White v. Vann, 6 Humph. 73. There is no proof either in the testimony or the agreed statement of facts in this cause, as to any such custom, nor is one pleaded by the defendant. The record is silent on the subject, and it is not a matter of such general notoriety, in my opinion, that the court would be justified in taking judicial notice of it.

### DISSENTING OPINION.

BOND, J.—This action is not brought against a carrier for damages on account of loss or injury to goods occurring during their transportation. It is simply a suit to obtain possession of the goods, after their arrival at the point of destination, without paying to the delivering carrier the Government dues, for the importation of the goods, which were collected at the port of St. Paul and which the defendant, the last carrier, paid as advance charges in order to obtain the

goods and carry them to their owner. The ground of refusal to refund this payment, relied upon by respondent is, that by his contract, in Japan, with the initial carrier, it (the tariff) was to be collected at the port of St. Louis, which was also the place of destination of the goods, and that inasmuch as the sum so paid by the carrier was assessed by the custom officers at St. Paul instead of St. Louis—although the same in amount—he (the owner) should be entitled to receive the goods at St. Louis without repaying the delivering carrier what it had advanced. In other words, respondent's theory, and the judgment in his favor of the lower court, would give him his goods scot-free of duty. This is the ultimate position of the respondent under the record before us. In support thereof, he insists that the Government tax was collected in St. Paul by reason of the unlawful delivery of the goods to its officers at that place by the preceding carrier. Granting this for the argument, still it only tends to prove that he would be entitled to an action against the initial carrier or the other carrier which diverted the goods, for any damages caused by the acts of the customs officers at St. Paul. It does not at all prove that he should receive his goods without paying the duties leviable thereon under the Federal law. The fact that such duties were collected at one port rather than another, did not destroy the right of the Government to the imposts themselves. It may have constituted a ground for relief in the court of claims, or elsewhere, for injuries to the goods occasioned by the assessment of duties at a particular customhouse; but it could not exempt the goods from all liability for the paramount claim of the Government, enforcible *in rem,* and without satisfaction of which neither the owner nor his agents could obtain the property.

It appears this Government lien on the goods was paid, in the case at bar, by appellant and those acting for it; that

the goods when delivered to appellant for final carriage to their destination, were accompanied by a waybill including this Government charge, as a part of the forwarding charges; that appellant, on behalf of the owner, satisfied and discharged it; that the sum thus paid was the correct amount of the duties to which the goods were subject, and, hence, was not illegal. The *power* of the Government to enforce it was absolute. To. release the Government's hold of the goods, it was paid. If this had not been done the importation of the goods would have ended at the port of entry where it was assessed. To reimburse the first paying carrier, it was exacted of appellant as a forwarding charge. Possessing these incidents and coming to appellant's notice in this manner and as a condition of further transportation of the goods, the payment thereof on behalf of the respondent in his absence and the existing exigency, was made upon grounds affording a fair inference of agency for him and which entitled appellant to subrogation to the lien of the Government for the charges of importation. And even if that lien did not technically arise until the goods got to St. Louis, still the payment made by appellant was a *satisfaction in anticipation* of a lien which must accrue in full vigor at St. Louis and, therefore, entitled appellant, when the goods arrived at that point, to be subrogated to the right of the Government the same as if it had delayed the payment of the Government dues until that point had been reached. For there (St. Louis) it had the unquestionable right to satisfy the claim of the Government upon the goods before delivering them to the consignee. Steamboat Virginia v. Kraft, 25 Mo. 76.

I hold that the plaintiff has no right to recover in this action, hence, I can not concur in the able opinions of my brothers, *Bland* and *Goode*.