# Gustav W. Lembeck

*v.*

# Jarvis Terminal Cold Storage Company.

[Filed November 19th, 1904.]

1. In the absence of fraud, the lien of a common carrier for freight is lost by an actual delivery to the consignee.

2. Where a carrier delivers goods to a consignee, who agrees to hold them until the freight charges are paid, the agency thus created, if any, is for collection only, and after the charges are received by the consignee, the carrier cannot assert any claim against a third person acquiring an interest in the goods without notice of such claim.

3. A carrier delivered goods to a consignee without receiving payment of freight, and petitioner acquired rights therein, as pledgee, without notice of a claim for freight, and on delivery to them they deposited the amount of the freight under an agreement that the right thereto be settled afterwards. Petitioner sold the goods and brought a suit to recover the deposit, based on the question of priority of liens.—*Held*, that the defendant could not, in such action, raise the question of its right to the surplus remaining in the hands of the petitioner after said sale by it.

Heard on petition of Sanborn-Farrell Company et al., answer of Erie Railroad Company, and proofs.

The main case was an action to have the Jarvis Terminal Cold Storage Company enjoined and a receiver appointed, under the Corporation act, upon the ground of insolvency.

At the time of the appointment of the receivers there was in the warehouse of the defendant company certain property which had been shipped by Gardemann & Jungclaus to the Jarvis Terminal Cold Storage Company.

The Sanborn-Farrell Company were removing this property in parcels or installments under orders authorizing them to do so, which orders were given to them by Gardemann & Jungclaus.

The Erie Railroad Company claimed a lien upon the property for freight charges, and thereupon the receivers of the Jarvis

company refused to permit the remaining portion of the property to be removed, and a stipulation was entered into between the parties which reads as follows:

"Received, Jersey City, April 30th, 1904, from Sanborn-Farrell Company, seven hundred and forty-three dollars ($743), which sum is received by the undersigned on deposit to stand in lieu of goods now on storage with the Jarvis Terminal Cold Storage Company, being balance of goods heretofore stored there by the firm of Gardemann & Jungclaus. It is claimed by the Erie Railroad Company that they have a lien upon said goods for freight charges, and this money is to be held by the receivers in lieu of the goods, to be subject to said lien, if any there be, and the deposit is made without prejudice to the rights of any of the parties in interest as to the question of freight lien or liability by Gardemann & Jungclaus or their assigns to pay the same, and the money is to be retained by the receivers until the direction of the court of chancery as to its disposition. If it is determined by the court of chancery that there is not any lien upon the goods for freight by the Erie Railroad Company, the money is to be returned to the depositors, the said Sanborn-Farrell Company.

"It is further understood that this money is simply a deposit with the receivers, and is not to be considered in any way assets of the Jarvis Terminal Cold Storage Company in their hands.

"J. W. HARDENBERGH,
"PALMER CAMPBELL,
*"Receivers Jarvis Terminal Cold Storage Company."*

The Sanborn-Farrell Company then filed a petition joining with themselves as petitioners the Western Cold Storage Company, which company claims to have advanced some $2,700 on the same goods, praying that the court should direct the receivers to return the $743 deposited under the stipulation to the Sanborn-Farrell Company.

To this petition the Erie Railroad Company filed an answer, and it is the issue raised by these pleadings, and the proofs which each side took to substantiate its allegations, that is here for determination.

*Mr. Frank E. Loughran,* for the petitioners.

*Messrs. Collins & Corbin,* for the Erie Railroad Company.

*Messrs. McDermott & Fisk,* for the receivers of the Jarvis Terminal Cold Storage Company.

GARRISON, V. C.

I find that on January 7th, 1904, Gardemann & Jungclaus, wholesale dealers and shippers of poultry, shipped from Newhall, Iowa, to the Jarvis Terminal Cold Storage Company, two carloads of poultry and dairy products, and upon the 16th of January shipped one carload, and that these cars arrived at Jersey City, over the Erie railroad, on the 16th and 18th of January, 1904.

When the cars arrived they were delivered by the agents of the railroad company to the consignee, the Jarvis Terminal Cold Storage Company, and in each instance after the delivery there was a request upon the part of the railroad to the Jarivs company to hold the goods until the freight charges should be paid, and a response by the superintendent of the Jarvis company to the railroad company that he would do all in his power to see that the goods were held until the freight charges were paid, so long as he remained superintendent.

Subsequently freight bills were sent to the consignee by the railroad company.

In the early part of February, 1904, Gardemann & Jungclaus, who were the owners of the property consigned to the Jarvis company, were desirous of borrowing $5,000 upon the credit of this property. By communications which passed between Gardemann & Jungclaus and the Jarvis company it was arranged that Gardemann & Jungclaus should make their promissory note to the Jarvis company for $5,743, which note was to be discounted by the Third National Bank of Jersey City, and that the Jarvis company should honor a draft for $5,000 in favor of Gardemann & Jungclaus, and should retain the $743, which is the amount of the freight charge, plus a small item of insurance.

Thereupon the proper papers to carry out this arrangement were executed, and the Jarvis company obtained the discount from the Third National Bank, pledging the property in its custody as collateral security, giving to the bank for this purpose a warehouse receipt in which was set forth the property pledged, which receipt contained no notice of any lien for freight.

In April of 1904 the Western Cold Storage Company advanced moneys to Gardemann & Jungclaus on the same property

and received chattel mortgages thereon from Gardemann & Jungclaus, the amount of their advances being about $2,700.

Sanborn-Farrell Company are the eastern agents of the Western Cold Storage Company, and it was arranged that they should obtain an order from Gardemann & Jungclaus for the delivery to them of the goods, and should sell the same and pay off the note of $5,743 made by Gardemann & Jungclaus to the Jarvis company and discounted by the Third National Bank, and should pay back the advances made by the Western Cold Storage Company.

They began taking the goods out of the warehouse in installments, paying the value of the proportional part of the goods so taken to the bank, upon the note held by it.

It was at this juncture, and about the 30th of April, 1904, that the Erie Railroad Company, claiming that it had a lien upon the goods, notified the receivers not to permit the goods to be taken out, and that the stipulation heretofore quoted was made.

The sole question that is to be determined in this proceeding, as I view it, is whether the Erie Railroad Company had a lien on the goods in question for the freight, which it might assert against the petitioners.

I am of opinion that the railroad company had lost its lien, and that as against the petitioners it cannot successfully assert that it has a lien.

A common carrier has a lien on goods carried by it and still in its possession for all charges that may be due to it for their transportation. *5 Am. & Eng. Encycl. L. (2d ed.) 399.*

But its lien is a mere right to retain the goods until the payment of the charges due thereon, and its lien is lost by a delivery of them to the owner or consignee. *5 Am. & Eng. Encycl. L. (2d ed.) 411; Hartshorne* ads. *Johnson,* 7 *N. J. Law (2 Halst.) 108 (Supreme Court, 1823).*

The contract of the carrier includes delivery, and the freight is not due until the delivery is made; therefore the delivery of the freight and the payment of the charges are concurrent acts. *5 Am. & Eng. Encycl. L. 405.*

If the consignee refuses to accept the goods and pay the

freight, the carrier has the right to store at the expense of the goods. *5 Am. & Eng. Encycl. L. 405.*

I think that that which is termed "the carrier's lien" is nothing more than the right to retain the goods until the charge for carriage is paid, and that there is in this respect an analogy between this so-called lien and the right which a seller has who sells goods for cash.

In each case there is a right to retain the goods until the price is paid, and delivery and payment are concurrent acts. In each case, if the receiver of the goods obtains possession by fraud, a right to pursue the goods remains. But if the goods are actually delivered without fraud, the right to pursue the goods is lost, and the obligation to pay must be enforced against the person liable. *Bigelow v. Heaton, 6 Hill 43 (Supreme Court New York, 1843).*

Whether the consignor or the consignee, or both, are liable to the carrier for the freight charges depends upon the respective contracts made by the parties or implied by law. *Central Railroad of New Jersey v. McCartney, 68 N. J. Law (39 Vr.) 165 (Supreme Court, 1902).*

Leaving aside the cases in which fraud enters, the real question in each case is whether there has been an actual delivery of the goods by the carrier to the consignee.

In this connection it should be noted that cases cited from the admiralty courts should not be taken as controlling in jurisdictions where the lien is a strict common law lien.

In the admiralty courts a distinction is drawn between goods shipped on land and those shipped on water.

The reasons for this distinction are pointed out by Chief-Justice Taney in *Sears v. Wills, 66 U. S. 108; 17 L. Ed. 38.*

He says: "Courts of admiralty, when carrying into execution maritime contracts and liens, are not governed by the strict and technical rules of the common law, and deal with them upon equitable principles, and with reference to the usages and necessities of trade. And it often happens that the necessities and usages of trade require that the cargo should pass into the hands of the consignee before he pays the freight."

At common law there is no doubt that an unqualified delivery

to the consignee extinguishes the lien. *Bigelow* v. *Heaton, 4 Denio 496; Lane* v. *Old Colony Railroad Co., 14 Gray 143; Sears* v. *Wills, 4 Allen 212; Bowman* v. *Hilton, 11 Ohio 303; Wingard* v. *Banning, 39 Cal. 543; Sweet* v. *Pym, 1 East 4; Reineman* v. *C. C. & B. R. Co., 51 Iowa 338.*

It is the contention of the railroad company that it did not unqualifiedly deliver the goods to the consignee, but it asserts that it delivered the same to the consignee subject to the lien of the railroad company for freight.

In the first place, I do not find, as a matter of fact, that the proofs sustain this contention. I find that the railroad company delivered the goods before making any arrangement with the consignee about payment of freight charges, and that the only arrangement made was with the superintendent of the Jarvis company, the consignee, and was to the effect that he would do all in his power while he remained superintendent of the company to see that the goods were not removed until the freight charges were paid. He ceased to be superintendent of the company on April 4th, 1904, when the company was placed in the hands of the receivers.

And, furthermore, it does not seem to me to be consistent with the origin and theory of this lien to maintain the right of delivery of possession by the carrier to the consignee, subject to the lien, in any case where the rights of innocent third parties intervene.

This lien is retained while possession by the carrier is retained, and ceases when the carrier ceases to have possession.

To permit the carrier to give possession to the consignee and hold the property subject to the carrier's right or lien, "would be recognizing a right to retain after the property had ceased to be retained." *McFarland* v. *Wheeler, 26 Wend. 467* (at *p. 474*) (*Court of Errors of New York, 1841*).

It is not necessary in this case to decide what the law is where a carrier and a consignee agree that property shall be delivered to the latter to be held until the charges are paid.

Assuming that such an agreement created a lien as between the parties, and that as between the parties it is enforceable,

32

such lien would arise out of the convention of the parties and would not be the common law lien of the carrier, and would not follow the property into the hands of innocent third parties, or be effectual as against innocent third parties acquiring an interest in the property through or against the consignee.

There is such an inseparable connection between possession and the existence of the common law lien of the carrier that debate arose whether the lien was not lost in cases where the carrier deposited the goods in a warehouse of a third person; but the court held, and I think properly, that the possession of such third person was the possession of the carrier, and hence the lien remained. *Western Transportation Co.* v. *Barber, 56 N. Y. 544; 12 L. Ed. 165 (New York Court of Appeals, 1874).*

The railroad company, in the case at bar, seeks to extend this doctrine, and contends that the consignee here was their agent to hold possession subject to the lien. This, I think, is an unwarrantable extension of the doctrine, where the rights of third parties intervene.

Where one of two parties must bear a loss, the law imposes it upon that one whose lack of care made possible the happening of the loss. *Norfolk Southern Railroad Co.* v. *Barnes, 5 L. R. A. 611; 104 N. C. 25.*

By delivery to the consignee the carrier makes it possible for the former to deal with the property as his own and as if entirely free from lien, and if the consignee does so and loss thereby ensues, it is surely right that such loss should fall upon the carrier, since he could, by retaining possession, have prevented the happening of the loss.

As against third parties (without notice), the lien of the carrier was lost by delivery of possession to the consignee, even if the latter agreed with the carrier to hold possession subject to the lien. *McFarland* v. *Wheeler, supra.*

This case is directly in point, and the well-reasoned and clearly expressed opinion of Senator Verplanck states the law as I conclude the law is.

But should my conclusions as to the law upon this point be erroneous, and it should be decided that the Jarvis company, the consignee, must be held to have been constituted the agent

of the railroad company to hold possession for it, subject to the lien for freight, it would not, in my judgment, alter the result of the determination of this case. The utmost that the railroad company can legally claim to have established with respect to the relations between it and the Jarvis company is an agreement by the Jarvis company that "we will not let this property leave our possession until we receive the freight charges."

The Jarvis company did receive the freight charges.

I think if it be held that the Jarvis company was constituted an agent of the railroad company at all, its agency was to hold until it collected. This is the reasonable construction of such a contract as the railroad company claims to have proven in this case, and the various experts called by the respective parties practically agree that such is the customary construction in similar circumstances which arise in dealings between warehousemen and carriers.

I therefore conclude that in any view of the rights of the parties to this proceeding the Sanborn-Farrell Company is entitled to a return of the money deposited under the stipulation.

It is urged by counsel for the railroad company that if the court should find that it cannot assert its lien against the rights of the third parties, still the court should hold that the Sanborn-Farrell Company, having gotten possession of the goods, were bound to account to the railroad company and pay the freight charges out of any surplus realized by the sale of the goods over and above the amounts due the third parties.

In the first place, the contention between the parties arose out of the claim of the railroad company that it had a lien prior to the pledgee's rights represented by the Sanborn-Farrell Company. I find it had not.

Secondly, there is no proof that there was any surplus arising from the sale of the goods, and, finally, I do not think that the issue sought to be raised by the contention is within the issues made by the pleadings and proofs, and I think that if the railroad company has any such right as it claims it must seek its enforcement in some direct proceeding, and I am inclined to think that the proper forum would be a court of law.